**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Wesley J. WARWICK and Eunice B. Warwick, Defendants-Appellants.**

No. 81–2827.

United States Court of Appeals, Seventh Circuit.

Argued Oct. 25, 1982.

Decided Dec. 22, 1982.

Ronald Kotnik, Isaksen, Esch, Hart & Clark, Madison, Wis., for defendants-appellants.

Richsad Cohen, Asst. U.S. Atty., John R. Byrnes, U.S. Atty., Madison, Wis., for plaintiff-appellee.

Before CUMMINGS, Chief Judge, WOOD, Circuit Judge, and MAROVITZ,* Senior District Judge.

---

* The Honorable Abraham L. Marovitz, Senior District Judge of the Northern District of Illinois, is sitting by designation.

HARLINGTON WOOD, Jr., Circuit Judge.

This is an appeal from a district court decision awarding judgment of $40,368.68 plus interest to the Small Business Administration (SBA) on a promissory note in the amount of $60,000 given to assist in the establishment of an automobile painting business. The two issues on appeal are 1) whether the district court properly held that appellants had not adequately proved their defense that they were sureties, rather than principals, on the note, and were thus subsequently released by actions of the SBA and, 2) whether the district court properly determined that the appellants had not adequately proved their defense that the sale of the property mortgaged in connection with the note was "commercially unreasonable." Because we agree with the district court's determination that the appellants were principals on the note and that the sale was conducted in a commercially reasonable fashion, we affirm.

I.

For convenience, we adopt the district court's statement of facts, undisputed by appellants, as set forth below:

In February, 1976, the Small Business Administration (SBA) made a $60,000 conditional loan commitment to Eugene L. Blowers and Wesley J. Warwick, a partnership d/b/a MAACO Auto Painting. SBA's commitment was made pursuant to an application submitted by both Blowers and Warwick, showing Eugene Blowers as Co-owner/Manager of the proposed business, with Wesley Warwick as Co-owner, . . . .

On April 28, 1976, both defendants and Eugene Blowers and Gloria Blowers signed a note to SBA in connection with the loan to the partnership. The men signed as partners; the women signed as wives.

The note included the provision that upon nonpayment of the debt or any part thereof, the SBA was empowered to sell all of

the collateral at public or private sale, "without demand, advertisement or notice of the time or place of sale or of any adjournment thereof, which are hereby expressly waived," and that the debtors waived "all right of redemption or appraisement whether before or after sale." The note included the additional provision that the SBA's security rights "shall not be impaired . . . by any indulgence, including but not limited to (a) any renewal, extension, or modification which Holder may grant with respect to the Indebtedness or any part thereof. . . ."

Also on April 12, 1976, defendants and Eugene Blowers and Gloria Blowers executed a security agreement making all machinery, equipment, furniture, fixtures, inventory and accounts receivable collateral on the April 26 note. On the same day, the two men executed a Certificate of Partners, an SBA document required of partnership applicants for loans. Attached to the document was a partnership agreement certified by both men as being a true copy of their agreement of partnership. The agreement stated that each partner would share equally in the profits and losses of the firm; that one partner would be elected as managing partner to administer the general affairs of the firm; and that the partnership could form a corporation for the purpose of carrying on its business, but that if it did so, both partners would remain liable permanently for the obligations assumed by the partnership.

\* \* \*

On October 26, 1976, pursuant to a request for deferral from Eugene Blowers based upon delays in the release of the $60,000 SBA deferred the first payment on the loan to January 28, 1977. Defendants' consent was not obtained for the deferral, although the Modification Agreement provided for the signatures of all four of the obligors on the original loan and the cover letter advised Eugene Blowers that the Modification Agreement must be received in the SBA office before the deferment could become effective. The SBA files do not contain any signed copies of the Modification Agreement.

At the end of 1976, the auto painting business was incorporated. An Assumption Agreement was entered into by the new corporation, Blowers-Warwick Enterprises, Inc., taking over the assets and liabilities of the partnership. The agreement was signed by both defendants and by Eugene and Gloria Blowers and it provided that nothing in the agreement operated to release the original partners of any of the obligations to SBA on the original note, security agreement, financing statement or assumption agreement.

The new corporation did not make its first payment to SBA on January 28, 1977, as required. It did make a $450 payment on February 8, 1977. On March 30, 1977, Eugene Blowers requested a reduced payment schedule for the first half of 1977. Defendants' consent to the new schedule was not obtained although, as before, Eugene Blowers was advised that a signed Modification Agreement must be received by SBA before the deferment could become effective.

Under the proposed modification agreement, monthly payments would be $450 for the first six months of 1977, with the $921 monthly payments resuming in the second half of 1977. The balance generated by the smaller $450 payments would be due at the loan's maturity.

The corporation made one additional $450 payment on May 18, 1977 and no others. It submitted a check for $900 in June, 1977, but the check proved to be uncollectible.

. . . On November 4, 1977, SBA made a demand for payment on its loan upon the corporation and each of the four signers of the note. When no payment was received, SBA notified the lessor of the business premises used by the corporation of its intent to hold a foreclosure sale on November 29, 1977.

. . . SBA arranged to have the sale conducted by Delta Auction Company, a General Services Administration-approved auctioneer which had been conducting auctions for SBA and other federal agencies for several years.

In preparation for the sale, the president of Delta Auction Company, Jasper Johns, made a brief visual inspection of the property to be auctioned. His initial appraisal was that the property might bring about $3000. Johns had had prior experience in the sale of spray painting equipment. He did not consult any equipment manuals or seek any additional appraisals of the equipment. He considered primarily the size of the equipment, the probable difficulty and expense of removing it, and the expense of transporting it to another location. He considered also the fact that the property would be sold "as is," with no warranties.

Delta Auction Company mailed out approximately 1000 notices of the auction, using its regular mailing list, the Yellow Pages of telephone books from the tri-state area including Tennessee, Mississippi, and Arkansas, and a list of MAACO franchise holders furnished it by SBA. A copy of the notice was sent to defendants who received it on December 16, 1977. The notice advertised the sale as a "Foreclosure Auction" and showed the property to be sold as

BINKS 26' DUST PROOF SPRAY
BOOTH, APPROX. 60 x 15 COMPLETE
FOR PAINTING CARS
(2) 10 HP AIR COMPRESORS [sic]
DECLOSER 7 GALLON CAPACITY
PAINT MIXING MACHINE WITH TABLE
100 GALLONS AUTO PAINT
(2) 5 GALLON PAINT BUCKETS
PAINT REGULATOR
7 SECTIONS METAL SHELVING
8 SELECTION COKE BOX
MANY MISC. ITEMS TOO NUMEROUS TO MENTION

*    *    *

Johns placed two advertisements of the [auction] in the *Commercial Appeal* in Memphis. The advertisements ran on Sunday, December 11, 1977, and Sunday, December 18, 1977.

Neither the mailed notices nor the newspaper advertisements listed the heater and oven as separate items to be sold. The heater and oven are a unique feature of the MAACO auto painting franchise operations. They enable the operator to give a newly-painted car a "factory-baked" finish, as compared to the air or fan-dried finish provided by most auto painting shops. The heater and oven are part of the entire 60'- long spray booth. Persons in the auto painting business are aware that MAACO shops have this unique feature and would be aware that a spray booth without a heater and oven would be considerably smaller than the 60' × 15' booth advertised for sale by Delta.

*    *    *

Twenty-two customers registered as bidders for the auction on December 19; two from as far away as Dayton, Ohio. At the commencement of the auction, bidders were informed that all property had to be removed from the premises before December 31, 1977. One customer made a bulk bid in the amount of $6500, which was held in abeyance until the conclusion of the auction. The SBA made an advance protective bid of $1000. Sold individually, the equipment and inventory brought in $9,047.00. Of this amount, the heater, oven and spray booth accounted for $5250 and the two air compressors for $2000. All of the equipment and inventory was sold. After deducting the auctioneer's fee, expenses of $450, and an additional month's rent of $1750 paid to the lessor of the premises, Delta remitted $5,942.30 to the SBA.

In the listing of collateral attached to the Supplemental Security Agreement, the equipment received from MAACO Enterprises, Inc. is shown as having a total cost of $27,066.12. The heater and oven are listed at $8,533.98; the spray booth is shown at $5,632.11; and the two air compressors, at $4,690.00.

The purchaser of the heater, oven, and spray booth paid $1600 to have them disassembled and loaded for shipment to Dayton, Ohio. The purchaser of the air compressors paid $750 to have them removed and cleaned.

Eugene Blowers was primarily responsible for acquiring the MAACO franchise and negotiating the SBA loan. Defendant Wesley Warwick joined with Eugene Blowers, who is Eunice Warwick's brother, in applying for the SBA loan after Eugene Blowers had been informed by the SBA that his own credit was not sufficient for a loan.

If it is correct to apply no more than the net proceeds of the December 19, 1977 auction, or $5,942.30, on the note to SBA, then the balance due on the note is as follows: principal: $40,368.68 plus interest accrued to May 14, 1979 at a daily rate of $7.43.

\* \* \*

The district court's findings of law and additional facts will be noted in connection with the discussion of specific issues.

## II. *The Status and Release of the Warwicks as Sureties on the Note*

At trial, appellants asserted that they signed the note as sureties rather than principals, despite the lack of any explicit statement to that effect on the SBA note. Thus, they argue, when the SBA twice permitted Eugene Blowers to defer payment on the loan without the approval of the appellants, the SBA released the appellants as sureties from their obligations on the underlying note. We agree with the district court that this argument lacks merit in light of the alternative bases that the Warwicks failed to consider themselves sureties, that they failed to communicate their putative surety status to the SBA, and that they explicitly waived any claim to release from liability on the basis of the SBA actions present here.

## A. *Eunice Warwick as Principal on the Note*

While, for reasons fully articulated below, this defense is obviously unavailing to appellant Wesley Warwick in view of his explicit affirmance that he was a partner and co-owner of the business, the basis of appellant Eunice Warwick's liability and her defense is somewhat different. She argued that, because she did not sign the note as "partner," but rather as "wife," and because she intended only to act as guarantor of the obligation of her brother, Eugene Blowers, to the SBA, she was never a principal, a state of affairs that was obvious to the SBA.

The district court disposed of her argument on three grounds. First, the court stated, she did not sign the note as a surety or guarantor and, citing *State Bank of Wa-*

*verly v. McCoy,* 232 Iowa 456, 3 N.W.2d 141 (1942), the court further noted that where no restriction to the contrary appears, there exists a presumption that the parties signing the agreement do so as principals. Second, the court found that Mrs. Warwick failed to offer proof that the SBA had knowledge of her status as surety. The court rejected the argument that, standing alone, her status as wife or her lack of managerial interest in the business constituted notice to the SBA that she was a surety. The court also deemed irrelevant to the notice question the fact that she did not apply for the loan or receive any of the loan proceeds. Finally, the court found that, in view of her high educational attainments and sophistication and her demeanor at trial indicating discomfort with her statements, Mrs. Warwick's testimony that she co-signed the note without any awareness that she was thereby subjected to principal liability was not credible.

The parties have agreed that, under applicable Tennessee law, the party claiming surety status bears the burden of proving that it agreed to such status and that the adverse party had knowledge of that status. We agree with the district court that the evidence neither indicated that Mrs. Warwick signed the note as a surety nor indicated that the SBA had knowledge of her putative suretyship.

First, and most importantly, although Mrs. Warwick testified that she signed the promissory note believing that her signature entailed no principal risk on her part, the district court found that her obvious sophistication and her "agitated and uncomfortable" demeanor in giving this testimony undercut her claim. Sitting as an appellate court, we must defer to the trial court's assessment of credibility based on such observations as witness demeanor. *Trabert and Hoeffer, Inc. v. Piaget Watch Corporation,* 633 F.2d 477, 479 (7th Cir.1980); *Denison Mines, Limited v. Michigan Chemical Corp.,* 469 F.2d 1301, 1310 (7th Cir.1972). The district court also found Mrs. Warwick's profession of innocence as to her full liability incredible in view of her graduate-level education and her professional status

as a school administrator. Mrs. Warwick also testified that she had some years previously signed mortgage documents with her husband. We cannot label as clear error the district court's determination that Mrs. Warwick was aware that she had made a principal commitment on the note.

Nor do we find clear error in the district court's determination that, even assuming *arguendo* that Mrs. Warwick believed herself to be a surety, the SBA did not have notice of her non-principal status. Mrs. Warwick points to her signing only as "wife" on the note as giving adequate notice of her purported secondary status. But, as the district court concluded, relying on *State Bank of Waverly,* 232 Iowa 456, 3 N.W.2d 141 (1942), this alone does not destroy the presumption that a wife who cosigns a note is to be understood as a principal; the wife still bears the burden of proving that the adverse party had some additional knowledge of her putative suretyship relation. *Waverly,* 3 N.W.2d at 144.

Appellants attempt to distinguish *Waverly* on the basis that, in that case, the co-signing wife was benefited to the extent that the proceeds of the loan at issue were applied to the balance of a previous note which she signed as an obligor. Yet an examination of *Waverly* does not indicate that the court considered this benefit as bearing at all on the question of required *notice;* there, as here, there was no indication that the obligee could have been alerted to the obligor's suretyship status by the exigencies of some financial relationship remote from the transaction at issue. *See Waverly,* 3 N.W.2d at 144.

Appellants attempt to elaborate this argument into the proposition that the wife's failure to benefit directly from a loan on which she is a co-signing obligor alone constitutes notice to the obligee of her surety status. However, none of the cases cited by the appellants demonstrate this point, for in each case, there was present some additional factor alerting the obligee to the wife's non-principal status, *e.g.,* additional familiarity with the financial relationship between the borrowing parties, or the exist-

ence of a married women's disability statute which severely circumscribed the power of a wife to pledge her property on behalf of a husband's obligation. *See, e.g., American Trust Co. v. Waddle,* 162 Tenn. 412, 36 S.W.2d 894, 896 (1931) (wife liable to obligee only to the extent of her interest in jointly owned land conveyed as security, as obligee is charged with record notice of the interests and rights of wife in the parcel of land); *Allen v. Wireman,* 243 Ky. 156, 47 S.W.2d 928, 930 (1932) (wife held surety where lender is aware that wife's signature was "mere device" to evade married women's disability statute and in view of husband's first, unsuccessful attempt to secure loan as sole obligor); *Peoples Bank v. Baker,* 238 Ky. 473, 38 S.W.2d 225, 226 (1931) (wife held surety where transaction was attempt to evade married women's disability act); *Hart v. Bank of Russellville,* 127 Ky. 424, 105 S.W. 934, 936 (1907) (wife held surety where lender had long been familiar with the financial affairs and activities of husband and wife); *Oriental Building and Loan Association v. Nutley and Avondale R. Co.,* 129 N.J.Eq. 292, 19 A.2d 351, 352 (1941) (wife held to be surety in view of statutory presumption of her disability and lender's testimony that wife's signature was required only "as a matter of course"); *Ritter v. Bruss,* 116 Wis. 55, 92 N.W. 361, 363 (1902) (wife held surety where evidence showed that lender asked husband to have wife sign note as a secondary obligor); *Omaha National Bank v. Johnson,* 111 Wis. 372, 87 N.W. 237, 238 (1901) (obligor held mere surety where lender testified that he was aware of obligor's surety contract with principals and had heard obligor speak of his intention to merely "back up" the principals). In the present case, there was no evidence of any such statutory presumption or additional knowledge sufficient to apprise the SBA of Mrs. Warwick's purported surety status.

Appellants cite as evidence of such notice the deposition statement of an SBA section loan supervisor, Joe Dixon, that the agency requires wives' signatures so that it "will have the guarantee of the liability of the people for the loan." However, this state-

ment appears in the context of the full sentences, "I would assume that, you know, normally when this is done is [sic] that if real estate is in both names, you get both signatures so that you will have the guarantee of the liability of the people for the loan. In other words, you know as you know [sic], if the husband only signed and it was joint property, why there would be no way you can get at the property if they didn't pay." It appears, then, that Dixon used the term "guarantee" not in a technical legal fashion to signify a suretyship relationship, but to indeed stress the desire of the SBA to have as co-signers all additional principal obligors necessary to make the security complete. This interpretation is furthered by Dixon's response when asked by appellants whether "you would have the wife sign to guarantee the obligation of the husband, is that what you are saying?" Dixon replied, "Not exactly. It would be a credit matter that we have cases where, you know, only the husband signs if he has got enough property in his own name to secure the loan. If he does not, we ask for the husband and wife both to sign. I am assuming that was the case at this time." Thus, nothing in Dixon's deposition testimony suggested any belief by the SBA that Eunice Warwick's signature on the note was in any way a secondary or ancillary "guarantee"; rather, the contrary is indicated.

Nonetheless, appellants urge, the trial court erred in refusing to draw a negative inference on the notice question from the government's failure to call Dixon to testify at trial. This argument is without merit.

█ First, an adverse inference is permitted to be drawn against a party from its failure to call a witness only when the witness is peculiarly within that party's power to produce. *United States v. Mahone,* 537 F.2d 922, 926 (7th Cir.1976), *cert. denied,* 429 U.S. 1025, 97 S.Ct. 646, 50 L.Ed.2d 627 (1976); *Gass v. United States,* 416 F.2d 767, 775 (D.C.Cir.1969). Here, the appellants simply declined to include Dixon on their pretrial list of potential witnesses, even though he was available and his testi-

mony could be considered relevant. Second, such a negative inference may not be drawn where the unpresented testimony would be merely cumulative. *Mahone,* 537 F.2d at 927; *United States v. Johnson,* 467 F.2d 804, 808 (1st Cir.1972), *cert. denied,* 410 U.S. 909, 93 S.Ct. 963, 35 L.Ed.2d 270 (1973). Here, in view of Dixon's previous answers at deposition to the precise "notice" question at issue, it is doubtful that additional light would have been shed by a continuation of this line of inquiry with the same witness.

In sum, we are unable to conclude that the district court erred in finding Eunice Warwick to be a principal on the SBA note.

### B. *Wesley Warwick as a Principal on the Note*

█ Appellants' argument that Wesley Warwick was a surety on the note is even more readily defeated. This argument rests principally on his avowal that he never understood himself to be a principal obligor on the note in view of Eugene Blowers' primary managerial responsibility for the business, or, alternatively, that his status changed when it became, or should have become, obvious to the SBA that he was not an active partner in the business, in view of Eugene Blowers' return of the loan modification agreements without Wesley Warwick's signature. We agree with the district court that these assertions cannot hold in light of the evidence adduced at trial.

First, as in the case of Eunice Warwick, the district court found Wesley Warwick's demeanor during his trial testimony to indicate discomfort with maintenance of his assertions; we must defer to the trial court's assessment of witness credibility when based upon such demeanor evidence. *Trabert and Hoeffer, Inc. v. Piaget Watch Corporation,* 633 F.2d 477, 479 (7th Cir. 1980). This, combined with Wesley Warwick's highly responsible professional position, leaves us unconvinced that the district court erred in finding that he fully understood the nature of the obligation he undertook in signing the SBA note and other documents as "partner."

Second, the *Waverly* presumption that a party's failure to qualify himself explicitly as a surety marks him as principal is even stronger in Wesley Warwick's case than in the case of his wife, in view of his initial claim and subsequent repeated reaffirmations of partnership in the business. Here, the original loan application stated that Blowers and Wesley Warwick were to be co-owners of the business, each with a half interest; the security agreement and note identified Blowers and Wesley Warwick as a partnership; there was a certificate of partnership executed later certifying that each were partners and would share equally in the profits and losses of the business, and that in the event the business was incorporated, both partners would remain fully liable for the business' previous obligations; in the Assumption Agreement, executed *after* the first loan payment deferral which appellants claim gave notice to the SBA of their non-principal status, Wesley Warwick still identified himself as partner; and that same Assumption Agreement provided that nothing in the agreement operated to release the existing partnership of any of the obligations to the SBA stemming from the original note.

Contrary to appellants' assertion, SBA's knowledge that Eugene Blowers was the operative manager of the business and chief correspondent with the SBA does not undermine the district court's finding that the SBA had no notice that Wesley Warwick was a surety; the fact that a partner participates minimally in a business does not impair his share of risks or benefits as partner. *See Levin v. Commissioner,* 199 F.2d 692, 694 (2d Cir.1952). Appellants also attack the district court's refusal to draw an inference against the SBA on the question of notice from the failure of the government to call as witnesses two highly placed SBA officials. But, as noted in II. A. *supra,* in view of the appellants' opportunity and subsequent refusal in their pretrial activities to arrange for the calling of these available witnesses, and in view of existing deposition testimony of the more highly placed SBA official, Joe Dixon, on the notice question, neither precondition for the

drawing of an adverse inference was present, *i.e.,* non-cumulativeness and the adverse party's peculiar control over witness availability. *Mahone,* 537 F.2d at 926, 927.

We cannot conclude that the district court erred in finding that Wesley Warwick's behavior belied his claims that he considered himself a surety and that notice of that status was communicated to the SBA.

## C.  *Waiver of Release*

The district court held that, even assuming *arguendo* that the appellants were sureties and that proper notice of their suretyship status was conveyed to the SBA, the appellants would still be liable to the SBA in view of their assent to a provision in the note that SBA's "security rights shall not be impaired ... by any indulgence, including but not limited to (a) any renewal, extension, or modification which Holder may grant with respect to the Indebtedness or any part thereof...." This waiver, the district court reasoned, made it impossible for the SBA's granting of two loan payment deferrals without the appellants' signature to release appellants from their obligations on the note even if they were considered sureties.

Appellants do not attack the structure of this argument, but instead suggest that the "security rights" protected by that provision include only the rights of the government in loan collateral, mentioned in immediately preceding paragraphs of the note, and not personal obligations, such as the Warwicks'. We find this argument unreasonably strained. First, the term "security" in common legal usage does not signify obligations backed by physical collateral alone but to any "[p]rotection; assurance; indemnification" or "obligation." Black's Law Dictionary 1216 (5th ed. 1979). Second, immediately following the clause at issue, the note goes on to further protect the government's security rights specifically in face of "any surrender, compromise, release, renewal ... which Holder may grant *in respect of the Collateral* ...." (emphasis added). This clearly indicates that the pro-

vision was more broadly directed at any impairment of *any* security rights of the government, not just those pertaining to collateral; otherwise, a specific protective provision covering impairment of rights in collateral would have been unnecessary.

We therefore agree with the district court's alternative holding that, even if appellants were sureties, they waived their rights of release on the basis of SBA loan modifications.

### III. *Commercial Reasonableness of the Public Sale*

■ The appellants challenge the district court's finding that the auction sale of the business property was commercially reasonable, citing as evidence the SBA's failure to explore the option of a private sale and the allegedly defective manner in which the public sale was conducted. Keeping in mind that commercial reasonableness is a question of fact, and that we may overturn the district court's findings only if they are "clearly erroneous," *United States v. Conrad Publishing Co.,* 589 F.2d 949, 954 (8th Cir.1978), we agree with the district court that the evidence indicated that both the choice and manner of the public sale was well within the reasonableness standard.

### A. *Choice of Public Sale*

Appellants initially argue that, while the SBA had the discretion to choose either a private or public sale, the choice of the latter in this case was unreasonable. First, they argue, the SBA refused to exercise any discretion at all, simply choosing a public sale reflexively and pursuant to a rigid policy. Second, they argue, the choice of a public sale was unreasonable in view of the specialized market for the equipment that was to be sold here.

The evidence does not support the appellants' assertion that the SBA failed to exercise discretion in its choice. At trial, David Smith of the SBA office in Nashville, Tennessee, testified that because he had "found in the past that when you start negotiating a private sale somebody's usually looking to steal it . . . I *usually* try to have every sale a public auction." (emphasis added). In addition, Smith noted his conclusion that in "this very situation we're in," a "well-advertised public auction" was the best solution. There is no indication in the record that the SBA *always* chose a public sale or that it would not have conducted a private sale if circumstances indicated that such a method would have produced a greater return. And although the equipment to be sold here was somewhat specialized, the evidence indicated that among those notified of the public sale were precisely the purchasers to whom such equipment would have the highest value, i.e., other MAACO franchisees and other auto painting businesses in Tennessee and surrounding states.

The cases cited by appellants in which the choice of a public auction was held commercially unreasonable are readily distinguishable. In *United States v. Willis,* 593 F.2d 247 (6th Cir.1979), for example, unlike here, the government proceeded with a public sale despite the existence of two outstanding firm offers to purchase the business at five times the price realized on the public sale; in addition, the responsible loan officer incorrectly informed the borrower that a public sale was *required. Willis,* 593 F.2d at 250, 259. And in *United States v. Terrey,* 554 F.2d 685, 690 (5th Cir.1977), the court found commercial unreasonableness where the SBA refused to postpone a public sale while the debtor was negotiating a private sale at a price equal to seven times the SBA's estimate of the value of the collateral. There is no such dramatic evidence here indicating that a private sale was feasible and preferable. Similarly, in *In re Four Star Music Co., Inc.,* 2 B.R. 454 (Bkrtcy.M.D.Tenn.1979), the creditor actually *turned aside* parties seeking to negotiate a private sale. *Four Star,* 2 B.R. at 457. Also, unlike here, although the item for sale in *Four Star* (a composer's music catalogue, and associated publication rights, which was heavily encumbered by legal claims) was unique, no attempt was made to reach the most logical purchasers (i.e., nationally based music publishers), but rather only an informal local network of music businesses was notified. Here, by contrast, formal

notice of the sale was sent to numerous auto painting businesses over a multistate area by an experienced auctioneer who had dealt with precisely this kind of equipment. *Cf. Four Star,* 2 B.R. at 457, 462, 463.

Other cases cited by appellants are similarly distinguishable. In *United States v. Conrad Publishing Co.,* 589 F.2d 949 (8th Cir.1978), for example, there was no attempt, unlike here, to reach the market best able to use the equipment. *Conrad,* 589 F.2d at 954. And in *Liberty National Bank v. Acme Tool Division,* 540 F.2d 1375 (10th Cir.1976), the court did not object at all to the choice of public sale, but merely to the lender's failure to follow the regular commercial practice, followed in the instant case, of hiring a professional auctioneer familiar with such equipment, advertising through a newspaper, and conducting the auction at a location propitious to sale. *Liberty,* 540 F.2d at 1377, 1381.

In sum, in contrast to the situations in the cases cited by appellants, here there were no circumstances such as outstanding private offers or untapped, unique submarkets that should have led the SBA to conclude that a private sale would have been more profitable than a public auction, where notice of the auction was in part to be targeted to precisely those businesses which would have the greatest use for the equipment offered. Contrary to appellants' assertion, there is no failure to exercise discretion where, as here, the SBA considered "this very situation" and weighed its past experience with private sales before following the "usual practice" of holding a public sale. Indeed, it is the SBA's *departure* from usual sale practice that has often received judicial reproof. *See, e.g., Terrey,* 554 F.2d at 695. We decline therefore to penalize the SBA for relying on its past experience in choosing the manner of sale, at least in the absence of evidence that it would not have been responsive to circumstances indicating that a private sale would have been more profitable. Especially in view of the high yield of the public sale here, the SBA's judgment seems to have been reasonably exercised.

#### B. *Manner in Which the Sale was Conducted*

In upholding as commercially reasonable the manner as well as the choice of the public sale, the district court pointed to the hiring of an experienced auctioneer who had dealt in similar equipment; the provision of an advertising budget sufficient to cover the costs of a mailing to approximately 1,000 persons and businesses (especially MAACO franchisees and other auto painting businesses) in the tri-state area including Tennessee, Mississippi and Arkansas, and advertisements in a newspaper of general circulation; the high turnout for the auction; and especially the recovery of over 30% of the original value of the equipment, which the court found especially high in view of the condition that they were sold "as is" and in view of the evidence offered by the SBA that additional thousands of dollars were spent by purchasers on dismantling the major items, bringing the total amount paid by purchasers in connection with these items, before freight charges were added, to nearly 60% of their original value. While appellants objected that the mailings were late and that the newspaper advertisements appeared only a week before the sale, and that both failed to note that the 60' × 15' spray booth item included an oven as well, the court found the large and geographically diverse origin of bidders to be probative of the reasonableness of the advertising lead time,[1] and that persons in the auto painting business were aware that a spray booth of the size advertised in connection with a MAACO franchise would include the oven as well.

---

1. The appellants argue that the district court erred by not drawing an inference against the SBA from its failure to produce at trial the secretary in charge of the auction company's mailings to testify as to the scope and timing of the mailings. However, no such inference could have been drawn, in view of the equal availability of this potential witness to the appellants. *United States v. Mahone,* 537 F.2d 922, 926 (7th Cir.1976), *cert. denied,* 429 U.S. 1025, 97 S.Ct. 646, 50 L.Ed.2d 627 (1976); *Gass v. United States,* 416 F.2d 767, 775 (D.C.Cir. 1969).

The cases cited by appellants do not support their argument that the sale procedures here were unreasonable. In *Connex Press, Inc. v. International Airmotive, Inc.,* 436 F.Supp. 51, 55 (D.D.C.1977), *aff'd without opinion,* 574 F.2d 636 (D.C.Cir.1978), and *United States v. Conrad Publications,* 589 F.2d 949, 954 (8th Cir.1978), for example, unlike here, the creditors made no attempt to attract logical potential buyers, and indeed in one case did not even use a list of such buyers in their possession to advertise the sale. *Connex,* 436 F.Supp. at 55. Likewise, here, there was no use of inexperienced or non-professional auctioneers, *cf. Liberty,* 540 F.2d at 1377; *Four Star,* 2 B.R. at 457, or failure to observe the normal commercial practice of holding the sale in a location propitious to sale, *cf. Liberty,* 540 F.2d at 1381. Especially in light of the substantial proceeds recovered from the sale, we decline to overturn the district court's finding that this heavily advertised, professionally run sale was conducted in a commercially unreasonable manner.

## CONCLUSION

Despite resourceful argument, the appellants have simply failed to identify any error of law or clear effort of fact in the district court's determination that they were not released from their obligations as principals and that the public sale was commercially reasonable. For this reason, the district court's award of judgment of $40,-368.68 plus interest to the SBA against appellants is affirmed.

AFFIRMED.