UNITED STATES of America, Plaintiff,

v.

Mark ROLLINSON, et al. Defendants.

Civ. A. No. 84–3397.

United States District Court, District of Columbia.

Feb. 28, 1986.

Mary Coster Williams, Asst. U.S. Atty., Washington, D.C., for plaintiff.

Lynne K. Zusman, Alexandria, Va., for Rollinson.

Charles R. Corbin, Jr., Washington, D.C., for Barnett.

JOYCE HENS GREEN, District Judge.

## MEMORANDUM OPINION AND ORDER

This case is before the Court on cross-motions for summary judgment. The United States seeks monies from defendants Edmund S. Barnett, Sr., and Mark Rollinson pursuant to guaranty agreements they executed in favor of the Small Business Administration ("SBA"). Defendants do not dispute the validity of the agreements they signed or that they have not made payments under them. Rather, they claim the action is time-barred and that in any event they were discharged from liability by virtue of alterations of the underlying obligation made by the SBA without their consent. Defendant Barnett, Sr., further argues that this Court lacks personal jurisdiction over him.

### I. *Background*

In October, 1973, Sounds Reasonable, Inc. ("SRI"), executed a promissory note in favor of the District of Columbia National Bank (the "Bank"), promising to repay a loan in the principal amount of $120,000, plus interest at a rate of 11 percent per annum. The SBA had previously entered into a Loan Guaranty Agreement with the Bank on April 26, 1973, which provided that the Bank could not make or consent to any alteration in the terms of any loan agreement without SBA's prior written consent. To further induce the Bank to make the loan, SRI secured unconditional guarantees from defendants Edmund Barnett, Sr. and Mark Rollinson, as well as Frances Shertz (formerly Frances Barnett), Edmund S. Barnett, Jr. (president of SRI), and Gary

Burke.[1] Each defendant signed a separate agreement in which they guaranteed the due and punctual payment of the $120,000 due under the note, and further gave the SBA the authority to modify the terms of the note.

Between November 11, 1974 and October 27, 1976, the Bank granted, at SRI's request, five deferrals of payments of principal, permitting the amounts deferred to be paid in a balloon payment at the maturity date. The Bank charged no additional interest, did not alter the amount of principal due and did not change the note's maturity date.

On April 1, 1977, and again on December 22, 1977, James A. Read, Vice President of the Bank, wrote defendants and informed them of SRI's defaults and delinquencies on the loan. The Bank did not demand payment in full, but rather requested that SRI's account be brought current. On April 11, 1978, the Bank assigned SRI's promissory note and the guaranty agreements executed by defendants to the SBA; the agency completed its purchase of the guaranteed portions of the loan on May 12, 1978. Several months later, Edmund S. Barnett, Jr., requested that the SBA refinance the loan, and on February 5, 1979, the SBA and SRI, through Barnett, Jr., executed a modification of the note. The modification deferred payment of overdue principal until the maturity date; reduced the monthly installments from $2,055 to $1,364; and pushed back the maturity date until October 16, 1989. The parties to this modification did not believe they needed the consent of the guarantors and evidently did not seek it.

SRI made a payment under the modified note on March 26, 1979, but failed to meet its next payment on April 16, 1979. On October 25, 1979, the SBA sent demand letters to each guarantor declaring that the entire balance was due and payable. The collateral securing the loan was sold on or about November 30, 1979, for approximately $17,000, and the SBA applied this amount to the outstanding debt. The government filed suit on November 6, 1984, seeking $153,710.45 in outstanding principal and interest accrued up through October 10, 1984, interest accruing from that date to the date of judgment at a daily rate of $30.27, and interest at the legal rate from the date of judgment until paid.

## II. *Analysis*

### A. *The Statute of Limitations*

Actions brought by the United States government upon any contract must be filed "within six years after the right of action accrues...." 28 U.S.C. § 2415(a) (1982). The relevant inquiry, therefore, is when the SBA's cause of action first accrued. Defendants argue that it ripened on April 1, 1977, the date on which the Bank first declared that SRI had defaulted on certain loan repayments, or alternatively, on May 12, 1978, the date the Bank assigned the note to the SBA. The Court cannot agree.

Defendants are correct in stating that under section 2415(a), the statute begins to run "when the claim first could be sued upon, rather than within six years of when the [g]overnment acquired the claim." *United States v. Cardinal*, 452 F.Supp. 542, 545 (D.Vt.1978). Relying on a series of cases involving federally insured student loans, defendants contend that suit can be brought on a promissory note, and thus a right of action accrues, when the borrower fails to make timely payments. Those cases are inapposite, however, because the statute creating the student loans at issue expressly provided that "default" occurred when the borrower was in arrears in payments 120 days after he or she was obligated to commence repayments. *See United States v. Lucas*, 516 F.Supp. 934, 935 n. 3 (E.D.Tex.1981), *United States v. DeGusta*, 512 F.Supp. 1299, 1301 (E.D.Cal.1981). In those cases, there-

---

1. Edmund Barnett, Jr., has been discharged in bankruptcy and the whereabouts of Gary Burke are not known. The government, therefore, did not name them as defendants. Frances Sherertz and the government reached a settlement agreement, and Sherertz was dismissed from the case on October 1, 1985.

fore, the borrower's default could be ascertained with mathematical certainty. The promissory note at issue here, by contrast, gives the holder of the note the authority to determine when the debtor is in default. It provides that the "[h]older is authorized to declare all or any part of the indebtedness immediately due and payable upon the happening of any of the following events: (1) Failure to pay any part of the indebtedness when due...." Plaintiff's Complaint, Exhibit A. It is well settled that

> where the acceleration of the installment payments in cases of default is optional on the part of the holder, then the entire debt *does not become due on the mere default of payment* but affirmative action by the creditor must be taken to make it known to the debtor that he has exercised his option to accelerate....

*United States v. Cardinal*, 452 F.Supp. at 547 (quoting *Moresi v. Far West Services, Inc.*, 291 F.Supp. 586, 588 (D.Hawaii 1968) (emphasis supplied)); *see also United States v. Gilmore*, 698 F.2d 1095, 1098 (10th Cir.1983) (SBA's cause of action accrued when it exercised its option under acceleration clause and statute of limitations began to run on that date); *Nyhus v. Travel Management Corp.*, 466 F.2d 440, 453 (D.C.Cir.1972) (where contract envisions demand, statute of limitations set in motion only by such demand). Accordingly, while the Bank had the right to demand payment on April 1, 1977, and likewise the SBA possessed the same right on May 12, 1978 when it purchased the note, neither exercised that right at those times. As the right to accelerate the installment payments was at the option of the holder, the cause of action was not perfected until a demand was made. The SBA first made such a demand on October 25, 1979, and

thus its right of action accrued on that date. The government filed this action on November 6, 1984, well within the six-year statutory period.[2]

### B. *Modification of the Contract*

### 1. *The Deferrals*

■■■ Defendants argue that the seven deferrals that the Bank and the SBA granted SRI modified and altered the terms of the note and thereby discharged them from their liability as guarantors. It is, of course, true that alterations in the underlying contract between a principal debtor and a creditor discharge a guarantor. *See* 10 *Williston on Contracts* § 1222 (3d ed. 1967). Here, however, the extensions or deferrals simply did not modify or alter the underlying contract, and in any event, the guaranty agreements expressly permitted such extensions.

In *United States v. Bachman*, 601 F.Supp. 1537 (E.D.Wisc.1985), defendant argued that she was discharged from liability as a guarantor by virtue of an agreement between the SBA and the principal debtor in which the SBA extended the interest period, deferred payments of past due amounts of principal, and agreed that payment of the entire loan would not be accelerated even though it had already made a demand for such payment. The court concluded that these agreements in no way "modifie[d], in any sense, the fundamental terms of the subject guaranty," *id.* at 1542, and thus that defendant guarantor was not discharged from her obligations. Similarly, in *Chevron Chemical Co. v. Mecham*, 536 F.Supp. 1036 (D.Utah 1982), the creditor granted two extensions to the principal in order to give the debtor an opportunity to bring its account current. Noting that the extensions did not affect

---

**2.** It is true, as defendants note, that "a party is not at liberty to stave off operation of the statute [of limitations] inordinately by failing to make demand." *Nyhus v. Travel Management Corp.*, 466 F.2d at 452–53. Here, the Bank and the SBA granted SRI several deferrals on principal payments between 1974 and 1978, and refinanced the loan in 1979. This action can hardly be characterized as unreasonable in view of the SBA's mandate to assist in the development of

small businesses. Indeed, after these deferrals SRI did commence payment. SRI's final default took place on April 16, 1979. Even if the SBA's failure to make demand for six months following that default was unreasonable, the Court would still be compelled to conclude that the agency's right of action accrued on or about April 16, 1979, and thus, that its filing of this action on November 6, 1984 was within the statutory period.

the due date on the note, the court found that they were more in the nature of "forbearances," and "did not effect a discharge of [the defendant's] independent liability based upon his guaranty." *Id.* at 1045 (footnote omitted).

So too here, the deferrals did not affect the note's maturity date, the amount of the obligation, or the rate of interest. The fundamental terms of the underlying contract, as well as those of the guaranty agreements, were not altered or modified by the deferrals. Rather, the deferrals operated as indulgences, excusing the guarantors for a given time from performing their obligations under the guaranty agreements. The defendants suggest that the extensions were highly prejudicial to their interest, permitting SRI to increase its debt while its equipment deteriorated and the collateral securing the debt depreciated. The fact is, however, that the deferrals did not affect the maturity date of the note, and thus in no way extended the period of time for which the defendants voluntarily assumed the risks of SRI's financial insolvency. In addition, after each deferral, SRI commenced making payments again, which obviously inured to the benefit of the defendants. It is simply unreasonable to expect the SBA to call in loans at the first sign of trouble; indeed, the agency has an institutional interest in attempting to help small businesses through periods of financial difficulty. *See United States v. Gilmore,* 698 F.2d at 1197–98 (in ruling that statute of limitations began running when SBA demanded payment, and not three years earlier when creditor defaulted, court noted that agency was attempting to get the creditor "back on its feet" again); *United States v. Bachman,*

601 F.Supp. at 1541–42 (deferrals did not alter contract, but simply reflected SBA's interest in attempting to meet creditor's particular financial needs).[3] The Court therefore concludes that the deferrals granted by the Bank and the SBA did not operate to discharge defendants' liability as guarantors.

Moreover, that guaranty that defendants signed expressly provides:

> [t]he Undersigned hereby grants to Lender full power, in its uncontrolled discretion and without notice to the undersigned but subject to any provisions of any agreement between the Debtor or any other party and Lender at the time in force, to deal in any manner with the Liabilities and the collateral, including, but without limiting the generality of the foregoing, the following powers: (a) To *modify* or otherwise change, *any terms* of all or any part of the Liabilities or rate of interest (but not to increase the principal amount of the note of the Debtor to Lender) *to grant any extension* or renewal thereof and any other indulgence with respect thereto....

Complaint, Exhibit B (emphasis supplied). Defendants insist that the agreement contemplates only one "extension," since that term is in the singular. Such a cramped reading, however, is inconsistent with the broadly phrased waiver, and at least one court has refused to limit nearly identical language in the manner defendants suggest. In *United States v. Warwick,* 695 F.2d 1063 (7th Cir.1982), the Seventh Circuit ruled that a guaranty agreement which provided that the SBA's "security rights shall not be impaired ... by any indulgence, including ... any renewal, ex-

---

**3.** Defendants cite several cases for the proposition that a guarantor's risks are increased by deferrals or extensions of time and thus discharge a guarantor's liability. None of the cases cited, however, is apposite. In *Federal Deposit Ins. Co. v. Manion,* 712 F.2d 295 (7th Cir.1983) and *Tomlin v. Ceres Corp.,* 507 F.2d 642 (5th Cir.1975), for example, the extensions at issue pushed back the maturity date of the note, thereby allowing the debtor additional time in which to increase his indebtedness. In *Dynalectron Corp. v. Jack Richards Aircraft Co.,* 337

F.Supp. 659 (D.Okla.1972), the guarantors were exonerated where collateral securing the debt was sold in a commercially unreasonable manner, and where the governing statute provided that *any* alteration of the principal obligation discharged a guarantor. Similarly, in *Rizal Commercial Bank v. Putnam,* 429 F.2d 1112 (9th Cir.1970), a guarantor was discharged from liability by operation of a statute that provided that any extension granted to the debtor without the guarantor's consent extinguished the latter's liability.

tension, or modification which Holder may grant with respect to the Indebtedness or any part thereof," permitted the SBA to grant two deferrals without releasing the appellants from their obligations. *Id.* at 1070–71. While defendants invoke a series of legal maxims for the general proposition that contractual terms are to be strictly interpreted, the guaranty provision they place such great emphasis on here—specifically the terms "extension," and "renewal," which are used in the singular—is simply illustrative of the powers granted to the holder of the note. Indeed, the contract expressly states that the examples of the powers granted are not to limit that power. Given the broad sweep of the guaranty agreement's waiver provision and the powers it conferred on the SBA, the Court cannot accept defendants' contention that those powers could only be exercised once, merely because they were illustrated in the singular. Accordingly, the Court finds that even if the deferrals would otherwise have discharged defendants as a matter of guaranty law generally, the guaranty at issue here allowed the SBA to grant such deferrals without so excusing defendants from their obligations.

### 2. *Modification*

■ Defendants also argue that, in addition to the deferrals, the parties to the underlying contract modified the fundamental terms of that agreement several times, thereby discharging them from liability. This contention merits little discussion. To begin with, as previously noted, the guaranty agreements specifically permitted the holder of the note to modify the terms, and thus even if defendants are correct that the parties altered the note, defendants remained liable. More importantly, however, defendants simply fail to demonstrate that there were any alterations of the note other than the February 5, 1979 modification. They point to loan committee minutes, to the deposition testimony of Mr. Read, and an affidavit of Barnett, Sr., in which reference is made to an unsigned modification and extension document dated July 16, 1976. But defend-

ants themselves concede that "it is unclear whether that document was ever signed by SRI or the Bank." Defendants' Motion for Summary Judgment at 22. Thus, defendants have proved nothing more than that the parties *considered* modifying the contract. Moreover, the February 5, 1979 modification refers to and changes the terms of the original contract, thereby indicating that no prior modification took place. On this showing, the Court can only conclude that the note was modified once—on February 5, 1979. Defendants concede that the guaranty agreements permit at least one modification of the note; accordingly, this modification in no way discharges them from their obligations.

### C. *Personal Jurisdiction Over Defendant Barnett*

Defendant Barnett, a resident of Nevada, raises the additional defense that this Court lacks personal jurisdiction over him. In his affidavit, he states that he neither conducts nor transacts any business in the District of Columbia, and was not a resident here at any time relevant to the cause of action. He does not own or lease any property here, and has only entered the jurisdiction to visit relatives. He executed the guaranty agreement in Nevada and mailed it to the District of Columbia; at no time has he come to the District of Columbia for any purpose related to the guaranty or the underlying note. Such incidental contact with this forum, he submits, is insufficient to subject him to the jurisdiction of this Court.

■ In response, the government argues that Barnett's undertaking as a guarantor of a contract to be performed within the District of Columbia places him squarely within the language of the District of Columbia long-arm statute, which permits courts to exercise personal jurisdiction over a person "who acts directly or by an agent, as to a claim for relief arising from the person's ... contracting to insure or act as surety for or on any ... contract, obligation or agreement located, executed or to be performed within the District of Colum-

bia at the time of contracting...." D.C. Code § 13–423(a)(6). Barnett cites *Black's Law Dictionary* for the general proposition that a surety is usually bound with his principal by the same instrument and is treated as an original promisor, while a guarantor's liability is secondary and is based upon a separate contract. This distinction, he contends, renders the long-arm statute inapplicable, since it reaches only those persons who act as surety, and makes no mention of guarantors. While neither party has directed the Court's attention to any case involving the District of Columbia long-arm statute and a contract of guaranty, the legal distinctions between a surety and a guarantor do not define the statute's reach. The statute confers jurisdiction over persons who "contract[ ] to insure ... any ... contract," and thus contemplates precisely the secondary liability that arises from a guaranty agreement. Accordingly, although the statute fails specifically to name contracts of guaranty, such contracts fall within its scope as a matter of substance if not nomenclature.

■ The government further relies on *Forsythe v. Overmyer*, 576 F.2d 779 (9th Cir.1978), a case in which the Ninth Circuit held that a non-resident defendant was subject to the jurisdiction of the California courts by virtue of a contract in which he guaranteed an obligation negotiated in California and governed by California laws. There, as here, the defendant executed the guaranty in another state and mailed it to the forum state; the guaranty was part of the negotiations leading up to, and an inducement for, the underlying obligation; and it was to have effect in the forum state, whose laws would govern its operation. The court concluded that this out-of-state act had a sufficient effect within the state to support jurisdiction. *Id.* at 783. While it is true that in *Overmyer* the defendant had other contacts with California, the court's finding of personal jurisdiction was predicated upon the guaranty itself, since the court had earlier concluded that the defendant's other contacts were insufficient to support the exercise of general jurisdiction over him. *Id.* at 782. Similarly, Barnett's out-of-state act has had an effect within this jurisdiction sufficient to render him amenable to suit here. Although he characterizes his guaranty as gratuitous, he executed it to benefit his son Edmund, Jr., president of SRI, and thereby to benefit himself at least indirectly. Moreover, entities within this jurisdiction relied upon that act. The Court finds, therefore, that defendant Barnett availed himself of the privilege of conducting activities in the District of Columbia and invoked the benefits and protections of its laws such that the exercise of personal jurisdiction over him does not offend traditional notions of due process.

### III. *Conclusion*

For all the foregoing reasons, it is this 28th day of February, 1986

ORDERED that judgment is hereby entered in favor of plaintiff, United States of America, and against defendants Edmund S. Barnett, Sr. and Mark Rollinson in the amount of $99,077.20 principal, plus accrued interest of $54,633.25, plus interest accruing at the daily rate of $30.27 from October 10, 1984 up until February 28, 1986, plus interest at the legal rate from this date until paid, less any amount the United States has received in settlement from defendant Sherertz.