UNITED STATES of America, Plaintiff,

v.

Julius LORINCE, Defendant.

No. 88 C 3900.

United States District Court,
N.D. Illinois, E.D.

May 13, 1991.

Fred Foreman, U.S. Atty., Anne L. Wallace, Asst., Chicago, Ill., for plaintiff.

Jeffrey Lawrence, Kelley, Kelley & Kelley, Schaumburg, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

ILANA DIAMOND ROVNER, District Judge.

### I. INTRODUCTION

In this action the United States seeks to enforce defendant Julius Lorince's guarantee of payment upon a promissory note. Pending before the Court are the parties' cross-motions for summary judgment. For the reasons set forth below, the Court denies the government's motion for summary judgment and grants Lorince's cross-motion for summary judgment on the ground that this action was filed beyond the statute of limitations.

### II. FACTS[1]

On or about August 15, 1978, the Bremen Bank & Trust Company of Tinley Park, Illinois ("Bremen Bank") made a loan to Villa Marie Restaurant, Inc. ("Villa Marie"). (Amended Complaint ¶ 2; Answer ¶ 2.) The Small Business Administration ("SBA") previously had agreed to guarantee 85 percent of this loan on July 5, 1978. (Lorince 12(e) ¶ 1 and Ex. A.) In exchange for the loan, Villa Marie executed a promissory note (the "Note") dated August 1, 1978 in the amount of $375,000, payable to Bremen Bank. (Amended Complaint ¶ 2 and Ex. A; Answer ¶ 2; Lorince 12(e) ¶ 2 and Ex. B.) Peter Poulakis and Kyriakos Poulakis, the principals of Villa Marie, each guaranteed payment of the Note by signing an SBA guarantee form. (Lorince 12(e) ¶ 3 and Ex.'s C and D.)

On or about December 4, 1978, Chablis III, Inc. ("Chablis") purchased the assets of Villa Marie. (Lorince 12(e) ¶ 4.) In connection with the purchase, Bremen Bank required Chablis and its three principals— Richard L. Hutchison, Lawrence Elkin, and Hazel Jackson—to guarantee payment of the Note. (*Id.* and Group Ex. E.)[2]

On or about January 4, 1980, defendant Julius Lorince purchased the stock of Chablis. (Lorince 12(e) ¶ 5 and Ex. F.) On February 29, 1980, Lorince executed his own guaranty of the Note. (Lorince 12(e) ¶ 6 and Ex. G.) Lorince also executed a separate, undated agreement to purchase the stock in Chablis owned by Hutchison and Elkin, together with their spouses, Joan Carole Hutchison and Temple Elkin (collectively, the "sellers").[3] (Lorince 12(e)

1. Lorince has properly submitted with his motion for summary judgment a statement of material facts as to which he contends there is no dispute, as required by local General Rule 12(e) (now superseded by General Rule 12(m)). The government has not submitted such a statement in support of its own motion for summary judgment, nor has it responded to Lorince's 12(e) statement as required by Rule 12(f) (now superseded by General Rule 12(n)). As this Court has noted, "[t]hese statements are critical to allow the court to focus on the relevant factual and legal issues without having to pore through exhibits and argumentative factual narratives in an attempt to discern which facts are agreed upon." *Herhold v. City of Chicago*, 723 F.Supp. 20, 22 n. 1 (N.D.Ill.1989). In view of the government's failure to comply with Local Rule 12, the Court has accepted as true all assertions of fact contained in Lorince's 12(e) statement. *See id.* However, where appropriate, the Court

has cited to certain exhibits which the government has submitted in support of its motion for summary judgment. In any event, neither party has contended that there is any question of material fact which precludes entry of summary judgment.

2. Each of these individuals, as well as Lorince (who subsequently signed his own guaranty on the Note as described below), agreed to become an *"additional* guarantor" of the Note. (*See* Lorince 12(e) Group Ex.'s E, G.) (Emphasis supplied.) Thus, it does not appear that the execution of guaranty agreements with Bremen Bank by these individuals absolved the prior guarantors of liability to Bremen Bank.

3. It is unclear from the record what Hazel Jackson's status was as of the date of this stock purchase. The purchase agreement makes reference to her (as well as James E. Jackson), but

Ex. F.) Pursuant to this agreement, Lorince agreed to indemnify and hold harmless the sellers as to any liability arising out of the Note or the guaranties, including liability to the SBA, Bremen Bank, Hazel and James E. Jackson, or Kyriakos and Peter Poulakis. (*Id.* Ex. F ¶ 3.)

John W. Davis purchased the assets of Chablis from Lorince pursuant to an agreement dated July 26, 1980. (Lorince 12(e) ¶ 8 and Ex. I.) In connection with this purchase, Davis, individually and as the president of Leonardo al Dente Restaurant, Inc. ("Leonardo al Dente"), executed an agreement dated June 30, 1980 pursuant to which he and Leonardo al Dente "assume[d] and agree[d] to pay the indebtedness evidenced by the ... Note in accordance with the terms thereof, on which there [was] a present unpaid principal balance in the amount of approximately $333,800.00" (Lorince 12(e) ¶ 7 and Ex. H.) Pursuant to the July 26, 1980 purchase agreement which followed, Davis further agreed to assume the SBA loan made by Bremen Bank (referred to in the agreement as the "SBA loan"), and "to indemnify and save [Chablis] and Julius Lorince, Richard L. Hutchison, Lawrence Elkin and James Jackson [4], harmless from and against any and all liability, costs, damages, expenses, judgments, and claims, including reasonable attorneys' fees, which they or any of them may incur, suffer, or sustain by reason of [Davis'] default in the repayment of the SBA Loan." (*Id.* at 2.) Davis also agreed to cooperate with Chablis in attempting to have the prior individual guaranties removed from the Loan. (*Id.*) However, this removal was not made a condition of the purchase (*see id.*) and, as is evident from the pending suit against Lorince, it never came to pass.

Leonardo al Dente went out of business on or about August 11, 1981. (Lorince 12(e) ¶ 9.) Bremen Bank wrote to Lorince on August 18, 1981, notifying him that the restaurant had closed its doors and defaulted on the Note and demanding that Lorince perform on his personal guarantee. (Lorince 12(e) ¶ 9 and Ex. J.) The letter indicated that a principal balance of $329,788.17 remained outstanding on the Note. (*Id.* Ex. J.)

Lorince has not made any payment upon the Note. (Amended Complaint ¶ 7; Answer ¶ 7.) The records of Bremen Bank indicate that the last payment made upon the Note was received on August 21, 1981. (Lorince 12(e) ¶ 10 and Ex. K, Attachments.)

On November 19, 1981, the SBA notified Bremen Bank that it would purchase the 85 percent of the loan which it had guaranteed. (Lorince 12(e) ¶ 13 and Ex. M.) On April 14, 1982, the SBA wrote to Lorince informing him that the maturity of the Note had been accelerated, and that the entire balance of principal and interest was due and payable. (Lorince 12(e) ¶ 14 and Ex. N.) The letter also notified Lorince that the SBA would conduct a public auction to liquidate the collateral which secured the loan and apply the proceeds to the outstanding principal and accumulated interest on the Note. (*Id.*) On April 27, 1982, the equipment and fixtures of Leonardo al Dente were sold at auction, yielding net proceeds of $29,757.27. (Lorince 12(e) ¶ 15 and Ex. O.) J & H Auctioneers & Liquidators, Inc. ("J & H"), which conducted the auction, wrote a check to the SBA for the amount of the net proceeds on May 4, 1982. (*Id.* and Ex. P.) The SBA received the check on May 5, 1982. (*Id.*) The SBA received an additional check from J & H in the amount of $26.75 on May 13, 1982. (Lorince 12(e) ¶ 16.) [5]

---

not as a seller, and she was not a signatory to the agreement. It appears that she previously may have sold her shares in Chablis. (*See* Lorince 12(e) Ex. F ¶ 3.)

4. Presumably, James Jackson was related in some way to Hazel Jackson; however, the record does not make this clear.

5. The record does not reflect the manner in which these proceeds were applied. If the SBA acted in accordance with its April 14, 1982 letter to Lorince, the proceeds presumably were applied first to the accumulated interest and then to the principal.

The government filed this action on May 3, 1988 [6], seeking to recover from Lorince an unpaid principal balance of $321,640.90 on the Note [7] plus interest which has accrued at the rate of 10 percent per annum and which, as of April 26, 1988, totalled $192,144.90. (Amended Complaint ¶ 6.) All other persons liable on the Note have discharged their obligations in bankruptcy. (Lorince 12(e) ¶ 17.) [8]

## III. ANALYSIS

The single issue presented by the cross-motions for summary judgment is whether the government's lawsuit is timely.[9] The applicable statute of limitations is set forth in 28 U.S.C. § 2415(a), which, in relevant part provides:

> ... [E]very action for money damages brought by the United States or an officer or agency thereof which is founded upon any contract express or implied in law or fact, shall be barred unless the complaint is filed within six years after the right of action accrues ...: *Provided,* That in the event of later partial payment or written acknowledgment of debt, the right of action shall be deemed to accrue again at the time of each such payment or acknowledgment....

(Emphasis in original.) The parties do not dispute the fact that the government failed to file this suit within six years after its cause of action first accrued. Thus, the particular question presented in this case is whether there has been either a partial payment or written acknowledgement of debt sufficient to renew the limitations period under § 2415(a).

### A. *Initial Accrual of the Cause of Action*

In evaluating the timeliness of this action, the Court must first determine when the limitations period commenced. According to the provisions of § 2415(a), the six-year limitations period begins to run when the cause of action first accrues. The general rule is that a cause of action upon a guarantee of a note accrues not upon a mere default in payment, but only when the creditor notifies the guarantor that the entire debt has been accelerated and demands payment of the entire balance. *See, e.g., United States v. Boozer,* 732 F.Supp. 20, 22 (N.D.N.Y.1990); *United States v. Lowy,* 703 F.Supp. 1040, 1043 (E.D.N.Y.1989); *United States v. Frey,* 708 F.Supp. 310, 312 (D.Kan.1988); *United States v. Rollinson,* 629 F.Supp. 581, 584 (D.D.C.1986), *aff'd,* 866 F.2d 1463 (D.C.Cir.), *cert. denied,* 493 U.S. 818, 110 S.Ct. 71, 107 L.Ed.2d 37 (1989). *See also United States v. Vanornum,* 912 F.2d 1023, 1025 (8th Cir.1990).

Lorince asserts that the cause of action initially accrued on August 18, 1981, when Bremen Bank notified Lorince that the Note was in default and demanded that he perform on his guarantee. (Lorince Mem. at 4, 6.) The government does not dispute this contention (*see* Government Mem. at 2), and the Court finds it to be well taken. The August 18, 1981 letter from Bremen Bank does not expressly mention acceleration of the Note nor does it expressly demand payment of the full amount outstanding. (*See* Lorince 12(e) Ex. J.)

---

**6.** The government's original complaint named both Hutchison and Lorince as defendants; however, on May 12, 1988, the government filed an amended complaint against Lorince alone.

**7.** This amount is slightly smaller than the balance of $329,788.17 recited in Bremen Bank's August 18, 1981 letter to Lorince. The record does not reflect whether the reduction is accounted for by application of the proceeds from the April 27, 1982 auction, payment by another guarantor, or something else.

**8.** Lorince has not named these individuals, but presumably they include each of the other people who executed guaranties, namely Peter Poulakis, Kyriakos Poulakis, Richard L. Hutchison, Lawrence Elkin, and Hazel Jackson. It is un-

clear from the record whether Davis ever executed a guaranty pursuant to his assumption of the Note in connection with his purchase of the assets of Chablis in 1980.

**9.** The government initially moved for summary judgment on the merits of its claim against Lorince. However, Lorince's subsequent cross-motion for summary judgment raised the issue of the timeliness of this suit, and the parties devoted the remainder of their briefing to that issue alone. Because, as set forth below, the Court concludes that this suit is barred by the statute of limitations, the Court does not reach the merits of the government's claim.

Nonetheless, the letter does indicate that the loan was in default, lists the outstanding balance, and demands that Lorince honor his guaranty. (*See id.*) Accordingly, the letter was sufficient to mark the initial accrual of the government's cause of action and to trigger the six-year limitations period.

The SBA sent what might be characterized as a second demand letter to Lorince on April 14, 1982. (Lorince 12(e) ¶ 14 and Ex. N.) Unlike Bremen Bank's August 18, 1981 letter, the SBA's letter expressly states that the Note had been accelerated and demands payment of the amounts outstanding. (*See id.* Ex. N.) However, even if the Court were to assume that the cause of action on the Note did not accrue until the date of the SBA's letter, that assumption alone would not render this suit timely. If the limitations period had not commenced until April 14, 1982, it nonetheless would have expired on April 14, 1988, more than two weeks before the government filed this lawsuit. Therefore, unless a subsequent partial payment or written acknowledgement of debt caused the limitations period to run anew, the government's action must be dismissed as untimely.

### B. *Partial Payment*

As set forth above, § 2415(a) provides that a partial payment of a debt owed to the United States renews the six-year limitations period. The government contends that the proceeds which the SBA received from the auction of Leonardo al Dente's equipment and fixtures on May 5, 1982 and May 13, 1982 constituted partial payments sufficient to renew the statutory limitations period under § 2415[10], because the equipment and fixtures were collateral and the SBA had a duty to apply the proceeds to the outstanding balance on the Note and thereby reduce the amount for which Lor-

ince was liable. Lorince disagrees on two grounds.

Lorince argues first that the SBA's liquidation of the collateral and application of the proceeds to the outstanding balance on the Note does not constitute a "payment" within the meaning of § 2415, because although this reduced the amount owed by the debtor (*i.e.* Davis or Leonardo al Dente), it did not necessarily reduce the amount Lorince owed as guarantor. This argument is not persuasive. The basis for the argument lies in the guaranty itself, which provides:

> The obligations of [Lorince] hereunder shall not be released, discharged, or in any way affected, nor shall [Lorince] have any rights or recourse against Lender, by reason of any action Lender may take or omit to take under the foregoing powers.

(Lorince 12(e) Ex. G.) Lorince argues that under the terms of this provision, the SBA's liquidation of collateral and use of the proceeds to pay down the outstanding balance on the Note would not reduce his own liability on the guaranty. However, this provision simply makes it clear that the powers which the lender enjoys under the guaranty are in fact elective, and that the guarantor cannot escape liability based upon which powers the lender chooses to exercise or not to exercise. *See, e.g., Istituto Mobiliare Italiano, S.p.A. v. Motorola, Inc.*, 689 F.Supp. 812, 817 (N.D.Ill.1988) (Bua, J.) (secured creditor's failure to act against assets securing loan does not vitiate liability of unconditional guarantor); *Rollinson, supra*, 629 F.Supp. at 584–86 (seven deferrals of principal payments by bank and SBA did not discharge guarantors from liability). Indeed, Lorince does not contend that the SBA has failed to give him the benefit of the auction proceeds in

---

**10.** The records of Bremen Bank reveal that it received a payment of $255 on the Note on August 21, 1981. The parties have assumed for the sake of argument that this payment constituted a partial payment within the meaning of 28 U.S.C. § 2415(a). (*See* Lorince Mem. at 6.) Thus, assuming that the limitations period initially began to run when Bremen Bank sent its August 18, 1981 letter to Lorince, the limitations

began to run anew three days later when the Bank received this partial payment. However, as with the SBA's April 14, 1982 letter, the additional time which this payment bestowed upon the government is inconsequential, for if August 21, 1981 were used as the starting date, the limitations period would be deemed to have expired on August 21, 1987, long before the government actually filed suit.

assessing his liability, and the record in fact suggests the opposite.

Lorince's second argument holds greater merit. Lorince argues that even if the SBA's application of the auction proceeds did reduce the debt for which he is responsible under the guaranty, this use of the auction proceeds does not qualify as a payment which would renew the statutory limitations period under § 2415(a) because it reflects neither his own acknowledgment of the debt nor his willingness to discharge it.

The legislative history of § 2415 reflects a congressional intent to codify the common law principle that "[t]he obligation of a debt will continue where a debtor has acknowledged the debt and indicated his willingness to discharge the obligation." *See* S.Rep. No. 1328, 89th Cong., 2d Sess. 3 (1966), *reprinted in* 1966 U.S.Code Cong. & Admin.News 2502, 2504. *See also United States v. Rollinson, supra,* 866 F.2d at 1468; *United States v. Blusal Meats, Inc.,* 817 F.2d 1007, 1010 (2d Cir.1987); *F.D.I.C. v. Petersen,* 770 F.2d 141, 144 (10th Cir. 1985) (dissenting opinion); *United States v. Glen Falls Ins. Co.,* 546 F.Supp. 643, 645 (N.D.N.Y.1982). This principle rests in turn upon the premise that when a debtor has unequivocally acknowledged a preexisting debt and demonstrated an intention to honor it, she has effectively made a new promise to pay the debt and thereby triggered a new limitations period. *See Rollinson,* 866 F.2d at 1468; *Glen Falls,* 546 F.Supp. at 645–46.

 In this context, not every partial payment of a debt is sufficient to start the statute of limitations running anew under § 2415; rather, the circumstances of the payment must reflect the intent of the debtor to honor the debt. As the court explained in *Glen Falls:*

> [W]hether part payment takes a case out of the statute of limitations depends on the intention of the debtor. It must be shown that there was part payment of an admitted debt, made and accepted in circumstances where an unequivocal promise may be inferred to pay the remainder of the debt. Thus, it is the intent of the debtor when he made the payment, not the intention of the creditor when he received the payment, that is the crucial inquiry here.

546 F.Supp. at 645–46.[11] *See also Joseph v. Carter,* 382 Ill. 461, 467, 47 N.E.2d 471, 474–75 (1943) ("Payment resulting in law in a new promise which would take the case out of the Statute of Limitations is only that designedly made as a payment upon the note. There must be an actual and affirmative intention to make such payment before a promise can be inferred.") The requirement of conduct evincing the debtor's affirmative intent to honor the debt makes intrinsic sense, for when a debtor takes no action or acts in an ambiguous manner, it is implausible to construe her conduct as any sort of "promise" to act further. Moreover, given the significant benefit which accrues to the government when the debt is acknowledged—namely, another six years in which to bring suit upon the debt—it is only reasonable to insist that the circumstances of the acknowledgement be plain, such that a reasonable person would have notice of the consequences of her conduct. Accordingly, the auction proceeds which the SBA received on May 5 and May 13, 1982 and applied to the Note may be deemed "partial

---

11. In *Glen Falls,* a building contractor defaulted on its obligations under a contract with the government, and the government sought to recover from the defendant, which had executed a performance bond as surety for the contractor. The government filed suit more than six years after the default occurred, but argued that the limitations period had been renewed three years after the default when the defendant sent a check to the government for an amount which was less than one-half of the performance bond. The court rejected this argument, relying upon a letter which had accompanied this check. 546 F.Supp. at 646. The letter asserted that the check "constitute[d] [the surety's] full obligation to the Government." *See id.* at 644. In the court's view, this letter precluded any inference that the surety intended the check to be a partial payment and in fact reflected the opposite intent, *i.e.,* that the debt be eradicated entirely. *Id.* at 646. Thus, however the government viewed the payment, the surety itself had made no new promise to honor the remaining debt which could trigger a new limitations period. *Id.* Accordingly, the court dismissed the suit as untimely. *Id.*

payments" sufficient to renew the limitations period under § 2415(a) only if they marked Lorince's acknowledgement of his obligation and his willingness to pay the outstanding balance of the Note. For the reasons set forth below, they do not.

As a practical matter, it is difficult to characterize use of the auction proceeds to reduce the outstanding balance on the Note as a *payment* for purposes of § 2415(a). The funds to effectuate that reduction came not from Lorince, but from the auctioneer which conducted the auction on the SBA's behalf. Moreover, prior to the auction, the SBA had already asserted control over the equipment and fixtures of Leonardo al Dente. Consequently, all the SBA accomplished through the auction was conversion of assets already in its possession from one form to another. Neither Lorince nor any other debtor or guarantor played any part in this transaction, and none of the funds used to reduce the outstanding balance on the Note came from their pockets. Accordingly, neither application of the auction proceeds nor the auction itself can properly be characterized as a partial payment for purposes of § 2415(a).

Indeed, at first blush, it would seem that to the extent there was any payment involved in the liquidation of the collateral, logically it would have occurred when the SBA first exerted ownership over the collateral prior to the auction. The record does not reflect when that event occurred. However, even if the Court were to assume that the SBA did not exercise control over the collateral until the date of the auction itself and use that date as the date of payment, it would be of no avail to the government. The auction took place on April 27, 1982, more than six years prior to the filing of this suit. Therefore, assuming that the limitations period began anew on the date of the auction, this suit would still be untimely.

Against this logic the government offers a more technical view of the transaction which would support its contention that *no* payment was made until the SBA actually received the auction proceeds. In the government's view, "[t]he proceeds of the sale of collateral are in substance funds owned by the debtor, whose right, title and interest to the property is being transferred pursuant to the Uniform Commercial Code ("UCC"), Section 9–504(4),[12] but subject to the secured party's paramount right to receive said funds for application against the loan balance." (Gov. Mem. at 2.) Thus, the government maintains that even once the SBA asserted control over the collateral it had not yet been "paid"; rather, until the SBA actually applied the auction proceeds to the outstanding balance of the Note, it merely enjoyed a lien upon the collateral. (*See id.* and Gov. Reply to Defendant's Supp. Mem. at 4.) *See* 70 C.J.S. *Payment* § 22 at 26 (1987) ("The mere taking of collateral security for a preexisting debt does not discharge the debt, nor do proceedings or attempts to secure payment by resort to the security where no payment results, or mere forbearance to enforce or collect the security, although payment thereby might have been obtained.") (footnotes omitted). The government further argues that because the debtor retained an ownership interest in the collateral until such time as the collateral was sold at auction and the proceeds were delivered to the SBA for application against the debt, the auctioneer should be viewed as the agent of the *debtor* rather than the SBA. Looking at the transaction from this perspective, the government concludes, receipt of the auction proceeds really was a payment on behalf of the debtor.

Assuming that the government's portrayal of the transaction is correct as a matter of law, the Court nonetheless concludes that transfer of the auction proceeds from the auctioneer to the SBA fails to

**12.** Section 9–504(4) of the Uniform Commercial Code provides that when a secured party disposes of collateral after a default upon an obligation, the disposition transfers to a purchaser for value all of the debtor's rights in the collateral and discharges the security interest. *See* Ill.Rev.Stat. ch. 26, ¶ 9–504(4) (1989). Based upon this provision, the government maintains that until the sale of the collateral, the debtor maintains an ownership interest in it; thus, even if the secured party has taken possession of the collateral and arranged for its disposition, the secured party has not yet been "paid" by the debtor.

qualify as a partial payment within the meaning of § 2415(a), because that payment does not evince Lorince's own acknowledgement and promise to repay the debt. The government itself characterizes the payment as one on behalf of the debtor rather than Lorince.[13] However, without more, a payment by or on behalf of the debtor does not renew the statute of limitations as to the guarantor. *See Rollinson*, 866 F.2d at 1468–69 (collecting authorities reflecting the general rule that partial payment of note by debtor does not toll statute of limitations against guarantor); *Petersen*, 770 F.2d at 143 (partial payment suspends statute of limitations only against party making such payment); *Kallenbach v. Dickinson*, 100 Ill. 427, 431 (1881) (payment by debtor does not arrest statute as against surety unless debtor is designated as surety's agent "not only for the purpose of liquidating the note by payment, but also for the purpose of doing what, in legal estimation, is necessary to make a new promise that will remove the bar of the statute"); *Korf v. Fansler*, 57 Ill.App.3d 440, 441–42, 15 Ill.Dec. 55, 56, 373 N.E.2d 325, 326 (2d Dist.1978) (payment by third party to creditor, which creditor applied to outstanding balance on promissory note, insufficient to indicate a promise to pay on the part of the debtor)[14]; *Deaton v. Deaton*, 109 Ill.App. 7, 10 (3d Dist.1903) (payment by principal does not extend statute as to guarantor). In this case, the record supplies no additional evidence which would permit attribution of the purported payment to Lorince. Although the record indicates that the SBA notified Lorince that the auction would take place, the record reflects no involvement by Lorince in either the conduct of the auction or disposition of the auction proceeds. Indeed, all that occurred on the two dates on which the government maintains the limitations period began to run anew was the SBA's receipt of checks from the auctioneer. To construe this receipt as action by Lorince reaffirming his obligations under the Note strains credulity and renders the premise underlying the partial payment provision of § 2415(a) an utter fiction. Thus, in *Hoffman v. Sheahin*, the court spurned the contention that a party's authority to liquidate collateral and apply the proceeds to an outstanding obligation should be considered the equivalent of authority to render a "voluntary" payment on the debtor's behalf:

> We think this extends the "agency" beyond its intended scope and ignores its true nature as well as the basis upon which payment is held to give new life to the debt. The "agency" is not one solely on behalf of the debtor, if indeed it is truly one at all. It is rather a power coupled with an interest, irrevocable by the donor. In exercising it the donee acts on behalf of the creditor, whether himself or another, rather than for the debtor, though the latter has empowered him to do the act. The application therefore lacks the voluntary character which gives to the debtor's own act, or to that of an agent acting solely on his account, the character of waiver of immunity and acknowledgment that the debt retains vitality.

121 F.2d 861, 862 (D.C.Cir.1941) (citation omitted). Moreover, such an untenable construction would permit the government

---

**13.** Thus, the government observes that the SBA looked to Lorince for payment of the deficiency on the Note only *after* the proceeds of the auction were applied to the Note. (*See* Gov. Mem. at 3.)

**14.** In *Korf*, the court found two additional facts inadequate to reflect a promise on the part of the debtor to honor the remainder of his debt. First, in attempting to collect upon the debt, the plaintiff had sent defendant a letter reminding him of the debt and recounting a conversation between them concerning the debt, and the plaintiff argued that the defendant's silence in response to this letter constituted an acknowledgement of his obligation. However, the court rejected the notion that the defendant's silence reflected the requisite "actual and affirmative intent" to make good upon the debt. 57 Ill. App.3d at 442, 15 Ill.Dec. at 56, 373 N.E.2d at 326. Second, in the course of a hearing before the trial court, the defendant had been asked whether he still owed the balance on the note, and the defendant had responded, "I suppose so." Nonetheless, the court concluded that this statement was not sufficiently indicative of either an intent to pay the balance of the note or an acknowledgement of his obligation to do so. *Id.* at 442, 15 Ill.Dec. at 56, 373 N.E.2d at 326.

to manipulate the timing of auctions and the disposition of auction proceeds in order to renew the statutory limitations period and thereby undermine the interests served by the statute of limitations. *See Zaks v. Elliott*, 106 F.2d 425, 427 (4th Cir.1939).[15]

Indeed, the notion that the creditor's liquidation of collateral qualifies as a partial payment which renews the statute of limitations long has been rejected by courts applying state statutes of limitations comparable to § 2415. These courts have reasoned that although the creditor in this context typically disposes of the collateral pursuant to authority granted by the debtor, usually the authority was given years before when the loan was first made; and at the point when the creditor avails himself of that authority, the debtor no longer has any say in the matter. Thus, it is implausible to construe from the creditor's action a new promise on behalf of the debtor. As Professor Williston has explained:

It would be a more logical position to deny that in any case a renewed right arises at the time payment is collected by the creditor from collateral in his hands, unless at least the debtor at the time of the sale voluntarily authorizes the credit or subsequently voluntarily ratifies it. In any other case though it be granted that the debtor originally authorized the collection, a new promise may fairly be implied only at the time when the authority was given. The authority when once given could not subsequently be revoked by the debtor had he wished to do so, and there is nothing from which it can be inferred that at the time the collection was made the debtor still acknowledged the existence of the debt or was willing to pay it.

1 S. Williston, *Williston on Contracts* § 176 at 695–96 (3d ed.1957) (footnotes omitted). *Accord Hoffman v. Sheahin*, 121 F.2d at 862 ("[a] power of application given when the debt is incurred expresses intention as of that time, not as of some time within or following the period of limitations"). *See also, e.g., Zaks v. Elliott*, 106 F.2d at 427 ("[a]ccording to the great weight of authority, an application to the debt by the creditor of the proceeds from the sale of collateral will not [renew the statute of limitations] because the payment is not voluntary on the part of the debtor"); *Easton v. Bigley*, 28 Wash.2d 674, 183 P.2d 780, 783 (1947) ("where part payment of a note is made from money realized by the sale of collateral, a new promise is not to be implied *as of the date of the sale* of the collateral *nor as of any date later than the transfer of the collateral to the creditor*") (emphasis in original); *Regan v. Williams*, 185 Mo. 620, 84 S.W. 959, 962 (1905) (per curiam) (mortgagee's authority to sell mortgaged property and apply proceeds to debt "cannot fairly be construed as an authority to the mortgagee to make a new promise on behalf of mortgagor to pay the debt, so as to avoid the statute of limitations"); *Wolford v. Cook*, 71 Minn. 77, 73 N.W. 706, 706–07 (1898) (creditor's liquidation of collateral and application of proceeds to balance of promissory note did not renew statute of limitations, because it was merely the exercise of a right bestowed upon creditor at the time loan was made rather than a voluntary payment by debtor evincing a new promise to pay the

---

**15.** The government argues that its freedom to renew the statute of limitations by controlling the timing of collateral sales could be constrained by the judicial imposition of a duty to act with reasonable dispatch. (Gov. Reply to Defendant's Supp. Mem. at 5.) *See Nyhus v. Travel Management Corp.*, 466 F.2d 440, 452–53 (D.C.Cir.1972) (where statute of limitations does not commence until party makes a demand, "a party is not at liberty to stave off operation of the statute inordinately by failing to make demand; when statutorily unstipulated, the time for demand is ordinarily a reasonable time"); *accord United States v. Vanornum, supra,* 912

F.2d at 1027; *Rollinson,* 866 F.2d at 1466. *But see United States v. Boozer, supra,* 732 F.Supp. at 23 n. 4, and *United States on behalf of SBA v. LaFrance,* 728 F.Supp. 1116, 1121–22 (D.Del. 1990), calling into question whether defenses of laches and equitable estoppel may be asserted against the United States. However, even assuming that the SBA is constrained to dispose of collateral within a reasonable period of time, the fact that it is the SBA which controls the disposition renders it implausible to construe that disposition as evidence of the guarantor's intent to honor the debt.

outstanding balance).[16] *Contrast First Nat. Bank of Oxford v. King,* 164 N.C. 303, 80 S.E. 251, 252 (1913) (where debtor delivered collateral to bank, designated bank cashier as his agent in event of his default upon note, and agreed to remain liable for any deficiency once collateral was liquidated and the proceeds applied to note, limitations period was revived more than six years later when cashier liquidated the collateral). Here, although there is no dispute that Lorince authorized the SBA to realize upon the collateral securing the loan, it is also plain that he did so at the time he signed the guaranty in 1980, not when the auction was conducted in 1982. Moreover, although the SBA gave Lorince notice of the auction in its letter of November 19, 1981, there is no evidence that Lorince thereafter did anything more than yield to the SBA's chosen course of conduct. *Compare Nunn v. W.T. McKnight & Bros.,* 79 Ark. 393, 96 S.W. 193, 194 (1906) (limitations period revived where debtor had been notified of sale and he assented to sale and application of proceeds to the debt), *with Wolford v. Cook,* 73 N.W. at 707 (limitations period not revived where debtor merely knew that plaintiff was exercising his contractual right to liquidate collateral and raised no objection). As the Minnesota Supreme Court explained in *Wolford,* mere acquiescence in the creditor's decision to employ his contractual right to liquidate collateral and apply the proceeds to the debt does not constitute a promise to satisfy the remaining deficiency:

The plaintiff's right to receive the proceeds of the collateral mortgages, and apply them in part payment of defendant's note, was acquired under and by virtue of the contract made at the time the collaterals were transferred to him. His subsequent exercise of that right was not a voluntary payment made by the defendant from which a promise to pay the residue can be inferred.... The fact that he made no objection when informed by plaintiff that he had applied the proceeds of these collaterals on his note could not take the case out of the statute. He had no reason to object, and, if he had done so, it would have been futile. Plaintiff had merely exercised a contract right which he acquired in 1889. Defendant's passive acquiescence in the exercise of that right constituted neither a voluntary payment as of that date, nor a new promise in writing to pay the balance of the debt.

*Id.* See also *Shanks v. Louthan,* 79 Kan. 363, 99 P. 613, 614 (1909) (mortgagor's knowledge that mortgagee in possession of property was applying net rental proceeds to balance of promissory note was not sufficient to renew statute of limitations). Thus, at the time the SBA received and applied the auction proceeds, Lorince cannot be said to have made any new promise to pay the Note which renewed the limitations period.

In arguing for a contrary result, the government relies in part upon *United States v. Quinones,* 36 B.R. 77 (D.P.R.1983). In that case, the district

---

**16.** Certain cases have emphasized the fact that the debtor was unaware that the collateral was being liquidated and applied to the debt in finding the lack of a voluntary payment by the debtor in these circumstances. *See, e.g., Regan v. Williams,* 84 S.W. at 962; *Wanamaker & Brown v. Plank,* 117 Ill.App. 327, 331 (1st Dist. 1904). Yet, as the court explained in *Wolford v. Cook,* the debtor's lack of knowledge is not dispositive:

Some of the cases may be misleading, for the reason that they seem to lay some stress on the fact that the debtor never knew of, and consequently never assented to, the application by the creditor of the proceeds of the collaterals. If the debtor had any option in the matter, or any power to object effectively to the application, there would be some force

in the suggestion that his assent to it amounted to a voluntary payment by him as of that date. But this cannot be so where the creditor is merely exercising an absolute legal right under the original contract.

73 N.W. at 707. The government has not contended here that Lorince had any authority to forestall or control liquidation of the collateral and disposition of the proceeds. Indeed, the face of the guaranty agreement gives the SBA unfettered discretion in that regard. (Lorince 12(e) Ex. G.) Thus, the fact that the SBA notified Lorince that the collateral would be auctioned and the proceeds used to reduce the principal and interest outstanding on the Note is immaterial in determining whether the transaction constituted a voluntary payment by Lorince.

court held that a partial payment upon a note, made by the trustee of a bankrupt's estate pursuant to a court order, was sufficient to renew the statute of limitations as to the bankrupt's co-debtors under § 2415. *Id.* at 79. The court reasoned that because the other debtors admitted that the payment reduced the amount for which they were liable under the note, they had effectively agreed that it amounted to a partial payment on their behalf within the meaning of § 2415. "Defendants have in fact acknowledged the existence of their debt and have impliedly promised to pay the balance by accepting the reduction in their liability." *Id.*

This Court finds the reasoning of *Quinones* to be flawed. First, payments must be voluntary in order to reflect the debtor's acknowledgment of his obligation. *Williston,* § 175 at 692, citing *Restatement of the Law of Contracts,* § 86(2)(b). For this reason, other courts have rejected the notion that payments made by trustees in bankruptcy qualify as partial payments reviving the statute of limitations. *See American Woolen Co. v. Samuelsohn,* 226 N.Y. 61, 123 N.E. 154, 156 (1919); *Simpson v. Tootle, Wheeler & Motter Mercantile Co.,* 42 Okl. 275, 141 P. 448, 449 (1914). In other words, although the debtor may benefit from the creditor's use of collateral proceeds to reduce her debt, the voluntary conduct on her part which is needed for that transaction to qualify as a partial payment under § 2415 is missing. The lack of a freely-rendered payment evincing the debtor's acknowledgment of the debt in these circumstances led the district court in *United States on behalf of SBA v. Richardson,* 1990 WL 27358 (E.D.Pa. March 12, 1990), to depart from *Quinones* and repudiate the notion that the debtor's mere acceptance of a reduction in the debt from application of the collateral proceeds reflects a "promise" by the debtor renewing the statute of limitations:

> The SBA argues here that the forced windfall, voluntarily accepted by defendant through the foreclosure sale, specifically the reduction of his debt owed to the government, is a ... statute-reviving acknowledgment of his debt. They contend that although the foreclosure and consequent payment on the debt was involuntary, he did not have to accept credit for that payment on his debt. Thus when he voluntarily did so, he made the requisite acknowledgment.
>
> Although one cannot help but admire counsel's ingenuity, this syllogism ultimately strikes me as specious. To proclaim this foreclosure payment voluntary is tantamount to proclaiming an eminent domain compensation—in which the propriety of the sovereign's taking has been challenged, albeit unsuccessfully—voluntary, because the condemnee ultimately accepted the compensation paid him as mandated by the takings clause of the Fifth Amendment of the United States Constitution.
>
> Under the circumstances, I decline to extend *Quinones* beyond its facts, in the strictly bankruptcy context. Unlike the debtors there, defendant here did not voluntarily seek the protection of bankruptcy court or seek the ratable distribution of his estate among his creditors. The only voluntary act done by defendant with regard to the Williamstown property was completed in 1977 when he pledged it as collateral to secure the original loan.

*Id.* at *2.

The issue of voluntariness aside, it remains widely recognized that payment made on behalf of one debtor does not toll the statute of limitations as to her fellow debtors. *See* authorities cited at page 1089, *supra.* The *Quinones* court's reliance upon the fact that such a payment reduces the remaining liability of the other debtors is misplaced, for that reduction is a result of contract principles, not any new promise to pay the debt which the other debtors have made. As the Missouri Supreme Court observed in *Regan v. Williams, supra:*

> [I]t is not the indorsement of a credit, but the *payment* that operates as a renewal of a promise and removes the bar of the statute of limitations. The party relying on a payment to stop the statute must not only establish that it was made,

but made by the authority of the defendant.

84 S.W. at 961 (citations omitted) (emphasis added).[17] Accordingly, only if the other debtors have voluntarily consented to the partial payment does that payment revive the statute of limitations as to them. *See Madison County Trust & Deposit Co. v. Smith*, 233 A.D. 623, 254 N.Y.S. 548 (1931) (contractual authorization of agent to make payment upon note "on behalf" of the maker and indorsers sufficed to bind them for a new limitations period when payment was made); *Mortgage Guarantee Co. v. Chotiner*, 8 Cal.2d 110, 64 P.2d 138, 140 (1936) (guarantors were bound by extensions of note despite their lack of contemporary knowledge and consent, where guaranty agreement provided that guarantors "authorize extensions without notice"). *But see Kallenbach v. Dickinson, supra*, 100 Ill. at 431 (agent must be authorized not only to make payment, but also to take action which renewed the statute of limitations).

The government also relies upon two Illinois cases in which courts concluded that payments administered by the creditor sufficed to toll the statute of limitations. Neither of these cases is applicable here, however. The first is *Joseph v. Carter, supra*, 382 Ill. 461, 47 N.E.2d 471. In *Joseph*, the appellant and his wife had jointly executed a note payable to a bank. When the note became past due, the bank appropriated funds from the private account of appellant's wife and applied them to the note. The question presented was whether this constituted a payment which tolled the statute of limitations as to appellant. The appellate court concluded that it was, for two principal reasons. First, in the appellate court's view, the terms of the note authorized the bank to apply the debtors' assets to the note. 314 Ill.App. 630, 638, 42 N.E.2d 321, 325 (1st Dist.1940). Second, there was evidence that the bank had asked

appellant whether it might apply the balance of his wife's account to the note and that appellant had given his consent. *Id.* at 640, 42 N.E.2d at 326. The Illinois Supreme Court reversed. With respect to the terms of the note, the supreme court held that although the note authorized the bank to apply the debtors' payments upon other liabilities to the note, that authorization could not be construed so broadly as to permit the bank to apply credits belonging to one of the debtors to the note. *Id.* 382 Ill. at 465–66, 47 N.E.2d at 474. The court then considered whether or not the appellant's apparent consent to use of his wife's account tolled the statute of limitations. The court took note of the rule that "one joint maker of a note cannot, by payment thereon or any other act, stop the running of the Statute of Limitations against the other joint maker, unless it appears that the party making the payment was the agent for that purpose." *Id.* at 466, 47 N.E.2d at 474. Thus, the statute of limitations could be tolled as to the appellant only if the bank, in applying his wife's account to the note, had acted as his authorized agent in doing so. *Id.* at 466, 47 N.E.2d at 474; *see also Sexton v. Brach*, 124 Ill.App.3d 202, 206, 79 Ill.Dec. 686, 689, 464 N.E.2d 284, 287 (3d Dist.1984). Turning to the record, the court observed that despite the appellant's apparent consent to application of his wife's account, there was no evidence that the appellant had the authority to permit that application or that his wife had either consented to or ratified the use of her account, such that the bank might be deemed to have acted as the appellant's authorized agent. *Id.* 382 Ill. at 466–67, 47 N.E.2d at 474.

Payment, to toll the statute, must be made by the debtor and not by the creditor. Nothing in the conversations between the bank officers and the appellant, as shown by this record brings this case within the rule of authorized agency on his part.

---

**17.** The court in *Regan* went on to note:

At the time of the sale the plaintiff had no interest in the property. He had no right to the proceeds of the sale. The money which, it is claimed, was applied in part payment of the note, was not his money. It would be applied by law to the extinguishment pro tanto of his debt, but the application was not under his control and involved no action of his mind. 84 S.W. at 962.

1094

*Id.* at 467, 47 N.E.2d at 474. The court acknowledged the bank's generally recognized right to set off the deposits of its debtors against any amounts owed to it. *Id.* at 467, 47 N.E.2d at 474. However, the court stressed that the exercise of that right by itself was not enough to toll the statute:

> Payment resulting in law in a new promise which would take the case out of the Statute of Limitations is only that designedly made as a payment upon the note. There must be an actual and affirmative intention to make such payment before a promise can be inferred.

*Id.* at 467, 47 N.E.2d at 474–75. Because the record revealed that the appellant had no authority to permit the bank's application of his wife's account, the court reaffirmed its conclusion that the bank had not acted as his agent in making that application. *Id.* at 467–68, 47 N.E.2d at 474–75. Consequently, the application did not toll the statute of limitations as to the appellant. *Id.* at 468, 47 N.E.2d at 475.

The government maintains that because the guaranty agreement in this case expressly authorized the SBA to liquidate the collateral and apply the proceeds to the balance of the Note, the SBA may be deemed to have acted as Lorince's agent when it exercised this authority. However, as set forth above, the mere fact that the SBA was authorized under the guaranty agreement to realize upon the collateral does not mean that its subsequent exercise of that power marked a renewed acknowledgment of and promise by Lorince to honor his debt. *See* authorities cited at pages 1090–91, *supra.*

The second Illinois case upon which the government relies is *Niehaus v. Niehaus,* 2 Ill.App.2d 434, 120 N.E.2d 66 (4th Dist. 1954). There, the court held that the statute of limitations upon a mortgage was tolled when the mortgagee, after the mortgagor's default, took possession of the mortgaged premises, collected the rents due, paid the taxes, and used the remaining income to reduce the outstanding balance of the mortgage. *Id.* at 443, 120 N.E.2d at 70. The government maintains that the

SBA is in the same position as the mortgagee in *Niehaus,* and that the SBA's application of the proceeds realized upon the collateral should be deemed to have renewed the statutory limitations period. Yet, in *Niehaus,* the mortgagee took possession of the premises pursuant to an oral agreement with the mortgagor *after* the mortgagor fell into arrears on the mortgages. *See id.* at 438, 120 N.E.2d at 68. Thus, the mortgagee effectively acted as the mortgagor's agent in managing the property and making payments upon the mortgage. *Contrast Shanks v. Louthan, supra,* 99 P. at 614 (mortgagor's knowledge that mortgagee had taken possession of property, collected rents, and applied proceeds to mortgagor's outstanding obligation not sufficient to revive statute of limitations; payment must be made by debtor or by someone acting under his direction in order to qualify as partial payment which renews limitations period); *Adams v. Holden,* 111 Iowa 54, 82 N.W. 468, 471 (1900) (defendants' possession of land, collection of rents and profits, and application of proceeds to debt did not remove case from statute of limitations: "if part payment of the debt from rents and profits be assumed, this payment was involuntary, and does not establish recognition of the debt"). Moreover, the court in *Niehaus* held only that the payments in question tolled the statute as to the principal debtors; it did not consider whether such payments would have tolled the statute as to guarantors in the position of Lorince.

Finally, this is not a case in which Lorince may be deemed to have consented to renewal of the limitations period. In arguing that it is, the government relies upon *United States v. Rollinson, supra,* 866 F.2d 1463. In *Rollinson,* the court concluded that an agreement to postpone the maturity date of a promissory note triggered a new limitations period as to the guarantor under § 2415(a). That agreement was entered into by the debtor and the SBA after the debtor defaulted on the loan and the note was assigned to the SBA. At the outset, the court acknowledged that as a general rule, the principal debtor does

not act as the guarantor's agent; consequently, partial payments and written acknowledgments made by the debtor do not normally toll or renew the limitations period as to the guarantor. 866 F.2d at 1468–69. However, the court also noted that the parties could alter this rule by agreement. *Id.* at 1469. Thus, where the guarantor has signed an agreement which authorizes the principal debtor to extend or renew the debt, a subsequent extension or renewal would trigger a new limitations period as to the guarantor. *Id.* The guarantor in *Rollinson* had signed such an agreement, authorizing the lender to modify any terms of the promissory note and to grant any extension or renewal in its unfettered discretion. *Id.* at 1471. Accordingly, the court held that the subsequent modification of the note was sufficient to continue the statute of limitations as to the guarantor. *Id.* at 1471–72.

The government maintains that this case is comparable to *Rollinson*, in that Lorince signed a guaranty which bestowed upon the lender complete discretion "to deal in any manner with the [l]iabilities and the collateral," including the authority "to realize upon the collateral or any part thereof. . . ." (Amended Complaint Ex. B.) Although this language clearly authorized the SBA to dispose of the collateral, it did not permit the SBA to renew the statutory limitations period in doing so. The government's argument overlooks a key aspect of the *Rollinson* opinion. The *Rollinson* court found that the limitations period had been tolled not simply because the guarantor had authorized extensions or renewals of the promissory note, but because, pursuant to that authority, the debtor and the SBA had entered into a subsequent agreement, supported by consideration, effectuating the extension or renewal. *Id.* at 1470–71, *citing FDIC v. Petersen, supra,*

770 F.2d at 143. Indeed, the court noted that even when the guarantor has consented to future extension or renewal of the promissory note, a mere partial payment by the debtor will not affect the statute of limitations. *Rollinson,* 866 F.2d at 1470. Here, there was no subsequent change in the terms of the Note; the SBA simply exercised its contractual right to dispose of the collateral. *Rollinson* makes clear that to the extent the exercise of that power resulted in a partial payment upon the Note, it did not suffice to renew the limitations period as to Lorince. *Id.* at 1469, 1470. Accordingly, to the extent the SBA's receipt of the auction proceeds constituted a partial payment upon the Note, it was not a payment which renewed the limitations period as to Lorince. *See id.* at 1470–71; *Petersen,* 770 F.2d at 143.

For all of these reasons, the Court concludes that the SBA's receipt of the auction proceeds on May 4 and 5, 1982 did not constitute partial payments renewing the statute of limitations as against Lorince under § 2415.

### C. *Written Acknowledgment of Debt*

The government also argues that on two occasions, Lorince acknowledged in writing his obligation under the guaranty. On May 4, 1982, August 5, 1982, and February 15, 1984, Lorince submitted "Offer in Compromise" forms to the SBA proposing to settle the SBA's claim for $1,000 and $5,000, respectively. (Supp. Aff. of Joseph J. Feldmann ¶¶ 7, 9, 10 and Ex.'s 6, 9, 10.)[18] With both the May 4, 1982 offer and the February 15, 1984 offer, Lorince submitted a "Financial Statement of Debtor" Form 770 supplied by the SBA. (*Id.* and Ex.'s 7, 11.)[19] Both statements appear to list the balance of the Note as a debt which Lorince owed to the SBA.[20] The government

**18.** Lorince submitted the May 4, 1982 offer jointly with Hutchison and Elkin, who had executed guaranties in connection with the 1978 purchase of Villa Marie by Chablis. The offers of August 5, 1982 and February 15, 1984 were submitted by Lorince alone.

**19.** Although Lorince submitted an offer on August 5, 1982, it is unclear whether he submitted

a separate financial statement with this offer. None appears in the record.

**20.** In certain respects, the financial statements are ambiguous. The May 4, 1982 Offer in Compromise lists an outstanding balance on the Note of $340,000. (Supp. Aff. of Joseph J. Feldmann Ex. 6.) The financial statement accompanying this offer lists two liabilities to the SBA—

argues that when Lorince listed the Note as a debt on his financial statements, he acknowledged that debt in writing, thus causing the limitations period to run anew under § 2415. The Court disagrees.

■■■ An acknowledgment in writing is sufficient to renew the limitations period if it is unequivocal and reflects an intent on the part of the debtor (or in this case, the guarantor) to pay the debt. *Glen Falls*, 546 F.Supp. at 645. *See also Blusal Meats*, 817 F.2d at 1010; *F.D.I.C. v. Cardona*, 723 F.2d 132, 137–38 (1st Cir.1983). The government contends that Lorince's financial statements fall within the scope of this rule because they list the Note as a liability without qualification or reservation. The government relies upon the following widely-quoted passage from Professor Corbin's treatise:

> The new promise to pay can be made in any form of expression, by word or act, that is capable of understanding and proof. It is very generally held that an acknowledgment that a sum of money is actually due, if made without any accompanying denial of willingness, justifies the inference of a promise to pay.

1A A. Corbin, *Corbin on Contracts* § 216 at 297 (1963) (footnote omitted). *See, e.g., Rollinson*, 866 F.2d at 1468; *Blusal Meats*, 817 F.2d at 1010; *Cardona*, 723 F.2d at 137. Corbin's statement of the law represents a somewhat relaxed approach to acknowledgment of a debt, in the sense that it does not require an affirmative demonstration of a willingness to pay the debt;

rather, the mere absence of a denial will do. *Compare Glen Falls*, 546 F.Supp. at 545–46 (circumstances of partial payment must reflect "an unequivocal promise" to pay remainder), *with Clarkson Co. v. Shaheen*, 533 F.Supp. 905, 932 (S.D.N.Y.1982) (acknowledgment of debt renews limitation period "if it recognizes the debt and contains nothing inconsistent with an intention to pay it"). Nonetheless, even this more lenient standard requires some affirmative "acknowledgment that a sum of money is actually due." 1A *Corbin* § 216 at 297; *see id.* at 299 ("[f]or a mere acknowledgment of the debt to justify the implication of an unconditional promise to pay, the acknowledgment must be definite and unconditional"). *See also Blusal Meats*, 817 F.2d at 1010.

Lorince's financial statements do not supply such an affirmative acknowledgment. As evidence of Lorince's intent, these statements cannot be divorced from either their purpose or context. Although the forms appear to list the balance of the Note as a liability, the forms were plainly prepared and submitted for purposes of negotiating a settlement with the SBA.[21] Indeed, the statements themselves are SBA forms, and completion of these forms is specifically required by the SBA in order for a compromise offer to be considered "workable". (*See* reverse side of Offer in Compromise form, "Instructions for Presenting Offer" and "Elements of a Workable Compromise Offer" ¶ 3, Supp. Aff. of Joseph J. Feldmann Ex.'s 7, 9,

---

one in the amount of $360,000, and another entitled "Contingent Liabilities, SBA guaranteed loan" in the amount of $300,000. (*Id.* Ex. 7.) Presumably, the Note balance is included in the first amount. The February 15, 1984 Offer in Compromise lists an outstanding balance on the Note of $379,868.98. (*Id.* Ex. 10.) The accompanying financial statement lists a single liability to the SBA in the amount of $380,000. (*Id.* Ex. 11.) Presumably, the balance was simply rounded off in this instance. In any event, the government argues that in both instances, Lorince listed the amount outstanding on the Note without characterizing the debt as being contingent or contested. Lorince has not disputed this assertion.

**21.** A settlement offer by itself is not sufficient to renew the statute of limitations. As Corbin has explained:

> An offer to pay a statement amount in compromise and settlement of a disputed claim is not an acknowledgment of indebtedness, even as to the amount offered; but it is a promise that is conditional on acceptance as settlement in full. This condition must be performed in order to make the promise itself enforceable. If it is accepted by the creditor, there is a sufficient consideration for the debtor's promise; there is a valid and enforceable accord executory. Payment as offered operates as complete satisfaction. If the offer is not accepted as made, the antecedent claim, barred or not barred, is not affected.

1A *Corbin* § 216 at 300–01 (footnotes omitted).

10.) [22] In the context of settlement negotiations, the defendant's financial situation and, in particular, his ability to pay any judgment which might be entered, is always a prime consideration. No doubt this is why the SBA requires completion of the financial statements before considering an offer of compromise; like any plaintiff considering settlement, it must take into account all of its debtor's liabilities—certain or contingent, disputed or undisputed—in order to assess his ability to pay any prospective judgment which the SBA might obtain. And like any defendant proposing settlement, Lorince had an incentive to disclose as many liabilities as he could on the financial statement—whatever he thought of their merits—in order to convince the SBA that he lacked the resources to pay a substantial judgment and that accordingly the SBA should settle for some amount less than the full amount of his guaranty. In this context, it is no surprise that Lorince would list the outstanding balance of the Note as one of his liabilities. It was after all, the SBA's claim on the guaranty of the Note that Lorince was attempting to settle, and listing the amount outstanding on the Note among his other debts was consistent with attempting to persuade the SBA that given the number of demands made against him, it should let him off the hook for the relatively paltry sums he offered in settlement. Perhaps when Lorince completed the financial statement forms he believed he was liable to the SBA for the full amount of the guaranty. Perhaps he thought the SBA's claim was meritless but hoped to avoid litigation and persuade the SBA to settle for the nuisance value of a future suit. Whatever Lorince's state of mind, to construe from his inclusion of the Note on the financial statements an unequivocal acknowledgement of liability and a promise to pay the SBA would ignore the context and motives which color those statements.

The Second Circuit reached a similar conclusion in *United States v. Blusal Meats, supra,* 817 F.2d 1007. In that case, a meat wholesaler (Blusal) and its principals had been criminally charged with conspiring to defraud the United States by obtaining food stamps from unauthorized sources and redeeming them under the false representation that they had been received from the sale of food to low-income individuals. The defendants pled guilty to the charges. In their pleas, defendants estimated that they had netted from $35,000 to $40,000 from their scheme, and counsel for one of the defendants reiterated that approximation at sentencing. Years later, the government filed a civil suit against Blusal seeking, *inter alia,* to recover the $40,000 which Blusal had purportedly gained from the criminal activity under the theory of unjust enrichment. The district court dismissed the claim as untimely. On appeal, the government argued that the statements which defendants and their counsel had made in connection with the criminal plea and sentencing hearings constituted an acknowledgement of their debt to the government sufficient to renew the statutory limitations period under § 2415(a). The court of appeals disagreed:

> The statements of [defendants] and their attorneys, relied on by the Government, do not satisfy the requirement that Blusal acknowledge[d] that it owed the claimed money to the United States. Made in the context of plea and sentencing proceedings, the defendants' admissions of guilt and estimates of illegal gains were clearly intended to downplay the amount of damages done by their crimes and to show their contrition in order to obtain lenient sentences. Nothing in the record or in the cited remarks supports the inference that the defendants' admission of wrongfully profiting by approximately $40,000 entailed an acknowledgment of indebtedness to the vic-

---

**22.** The text of the SBA Form 1150 "Offer in Compromise" makes it clear that the form is to be used for purposes of settlement:
This offer is submitted by the undersigned to compromise a claim of the Small Business Administration resulting from a loan to the above borrower which is now fully due and payable and for which I (we) am alleged to be liable.
(Supp. Aff. of Joseph J. Feldmann Ex.'s 7, 9, 10 at Box No. 1.)

tim for that amount. The sentencing judge might well have considered restitution in meting out punishment; however, the statements, without more, are not acknowledgements of debt within the meaning of the common law and section 2415(a).

*Id.* at 1010.

The fact that Lorince included the balance of the Note on the financial summaries he submitted to the SBA is arguably more of an acknowledgement of the debt than the statements at issue in *Blusal Meats.* Nonetheless, the Second Circuit's rationale is equally germane here. Lorince prepared the financial summaries in question for purposes of negotiating a settlement with the SBA. Viewed in that light, Lorince's portrayal of the Note as one of his obligations is subject to varying interpretations, as set forth above. To say that Lorince acknowledged the debt is plausible; but to say that he acknowledged it unequivocally and effectively "promised" to make good upon his obligation is to take his actions out of context and to ignore the realities of settlement negotiations, in which it is common for a party to acknowledge the merits of his opponent's case in an effort to hammer out an amicable resolution of the controversy.

As the government points out, courts have occasionally relied upon the defendant's financial statements as evidence of an acknowledgement of the debt for purposes of § 2415(a). Thus, in *F.D.I.C. v. Cardona, supra,* 723 F.2d 132, the court concluded that an executor's listing of three outstanding demand notes on an estate tax return constituted sufficient acknowledgment of those debts to renew the statute of limitations:

> Although it is in the interest of the estate for the executor to list on the tax return all of the amounts that the estate may reasonably claim as liabilities, a scrupulous executor would not list any amounts that the estate intended not to pay. We may fairly draw the inference that the estate intended to pay the Cardona debts listed on the tax return; any other interpretation would leave the es-

tate's executor vulnerable to a charge of tax evasion.

*Id.* at 137–38. Similarly, in *Clarkson Co. v. Shaheen, supra,* 533 F.Supp. at 932, the court concluded that when a company had referred to a "longstanding note" in its annual report and carried the balance of the note on its books for several years, it had recognized the "continuing validity of the obligation" and thereby renewed the statutory limitations period. *See also F.D.I.C. v. Consolidated Mortgage and Finance Corp.,* 691 F.Supp. 557, 564 (D.P.R.1988) (listing of debt in annual report filed with governmental office interrupted statute of limitations). In these cases, the debt was listed in financial summaries which were in effect "statements to the world" of the debtor's obligations. *See Cardona,* 723 F.2d at 137. In this setting, the debtors had the incentive, indeed the obligation, to portray their debts accurately and to exclude or disclaim debts which they did not intend to honor or which they believed were invalid. It was therefore fair to assume that by including their debts on their financial summaries, the debtors had demonstrated their intent to honor the debt. Here, in contrast, the meaning of Lorince's inclusion of the Note on the financial summaries is clouded by the fact that the summaries were prepared for and submitted to the SBA solely for purposes of a settlement proposal. Accordingly, the concrete evidence of the debtor's intent to make good upon his obligation which was present in *Cardona* and *Clarkson* is missing in this case. *Cf. In re Povill,* 105 F.2d 157, 160 (2d Cir.1939) (although listing of claim in bankrupt's schedules constituted an acknowledgment of the debt in a literal sense, it did not demonstrate the bankrupt's intention to pay the debt—in fact, it demonstrated just the opposite—and therefore did not interrupt the running of the statute of limitations); *Miwon, U.S.A., Inc. v. Crawford,* 629 F.Supp. 153, 156–57 (S.D.N.Y.1985) (defendant's statements acknowledging debt in deposition and trial testimony in prior litigation did not toll statute of limitations, as they were compulsory statements given under oath reflecting defendant's intent to tell the truth, not

intent to pay the debt). Had Lorince prepared and used the financial statements for other purposes, it might be appropriate to construe them as acknowledgments of an ongoing obligation. Because Lorince actually prepared them solely for purposes of a settlement offer, however, the statements lack the circumstantial indicia of either an admission of or an intent to honor the debt.

Indeed, the contents of the documents which accompanied the financial statements in question suggest that Lorince did *not* intend to honor his debt to the SBA. On the SBA Form 1150 "Offer in Compromise" which Lorince, Hutchison, and Elkin submitted on May 4, 1982, they wrote the following as the reasons why the SBA should accept their offer:

> Each of us spent our available cash and assets on the restaurant. Each of us borrowed heavily to the end of our credit limit and we are each paying back large loans representing money lost in the restaurant.

(Supp. Aff. of Joseph J. Feldmann Ex. 6.) The evident tenor of these remarks is that neither Lorince nor his fellow debtors could afford to pay anything on the Note beyond the $1,000 which they each were offering in settlement. On the Form 1150s which Lorince submitted on his own behalf on August 5, 1982 and February 15, 1984, this sentiment is expressed even more firmly:

> Due to the continued decline in the steel and steel related industry, upon which my ability to pay is dependent, I cannot see the near possibility of my submitting a greater amount than above.[23]

(*Id.* Ex.'s 9, 10.) These remarks make it all the more clear that the financial statements upon which the government relies were submitted in an attempt to avoid suit and settle the SBA's claim, and in that light cannot be characterized as a renewed promise to make good upon the guaranty.

The Court recognizes that its holding is contrary to that of the court in *United States v. Hosko,* No. 88–0088 (M.D.Pa. Feb. 28, 1989), *aff'd without published opinion,* No. 89–5267, 884 F.2d 1386 (3d Cir. August 4, 1989). In that case, the SBA wrote to the guarantors of a promissory note in default, requesting them to submit financial statements and tax returns so that an orderly settlement of the outstanding debt could be arranged. The guarantors complied with the SBA's request, providing it with financial statements which included the outstanding balance of the promissory note among their listed liabilities. A cover letter accompanying the statements indicated that the guarantors had only a limited income, but were hopeful that they could reach a settlement with the SBA. (*See* D.Ct.Op. at 6–7; App.Ct.Op. at 2–3.) Relying upon *Cardona, supra,* the district court concluded that the inclusion of the note among the liabilities listed on the guarantors' financial statement "constituted an effective acknowledgement of the debt" sufficient to renew the statute of limitations under § 2415(a). (D.Ct.Op. at 7–8.) The court of appeals agreed, rejecting the guarantors' contention that their reply to the SBA was a mere courtesy and that they actually believed that they owed the SBA nothing on the note:

> Mr. Hosko's subjective feeling that he did not owe any money, a feeling uncommunicated to SBA in his June 28, 1982 letter, is insufficient to create a genuine issue of material fact and so avoid summary judgment in the face of the plain, objective acknowledgment in the financial statement that he owed $225,000. "It is very generally held that an acknowledgment that a sum of money is actually due, if made without any accompanying denial of willingness, justifies the inference of a promise to pay." 1A A. Corbin, *Corbin on Contracts* § 216 (1963); *see Federal Deposit Ins. Corp. v. Cardona,* 723 F.2d 132, 137 (1st Cir. 1983). The financial statement plainly acknowledged indebtedness to SBA. The Hoskos' uncommunicated feeling that others were responsible does not negate acknowledgment.

---

**23.** Lorince proposed to pay the SBA $5,000 in the offers he submitted on August 5, 1982 and February 15, 1984. (*See* Supp. Aff. of Joseph J. Feldmann Ex.'s 9, 10.)

(App.Ct.Op. at 5) (footnote omitted).[24]

This Court declines to follow *Hosko* for the reasons it has set forth above. Although Lorince might be said to have acknowledged the Note to some degree by including it among his liabilities on the financial statements which he submitted to the SBA, given the circumstances of those statements, it cannot fairly be said that he unequivocally acknowledged the debt and manifested his intention to honor it. The financial statements were prepared solely for purposes of the settlement offer, and indeed were required by the SBA for that purpose. These were not statements prepared in the normal course of business, and upon which others might rely for purposes other than the settlement proposal. Thus, in contrast to the tax returns upon which the court relied in *Cardona,* the financial statements in question do not reflect an unequivocal affirmation of the debt. Lorince's financial statements must be viewed as an inseparable part of his proposal to settle the SBA's claim against him. To treat these statements as a decisive confession of liability imports meaning which the context of the statements does not reasonably permit. Indeed, the statement accompanying Lorince's individual settlement offers on August 5, 1982 and February 15, 1984 that he could not "see the near possibility of ... submitting a greater amount" than what he proposed in settlement[25]—a disclaimer far stronger than the guarantors' statement in *Hosko*—belies any notion that the financial statements manifested Lorince's intention to honor his debt to the SBA.[26]

Finally, the Court notes that using the financial statements which Lorince submitted to the SBA in the manner the government suggests would imbue settlement negotiations with the types of binding consequences that courts traditionally have been reluctant to recognize. Federal Rule of Evidence 408 reflects the longstanding tradition of refusing to rely upon statements made in the course of settlement discussions as evidence of a party's liability. In relevant part, Rule 408 provides:

> Evidence of (1) furnishing or offering or promising to furnish, or (2) accepting or offering or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount is not admissible to prove liability for or invalidity of the claim or its amount. Evidence of conduct or statements made in compromise negotiations is likewise not admissible....

Among the principal concerns which support this rule is the fear that if settlement offers or statements made in the course of settlement negotiations were accepted as admissions of liability on the part of the individual making the offer or statement, parties would shy away from attempts to resolve their disputes. *See, e.g., Perzinski v. Chevron Chemical Co.,* 503 F.2d 654, 658 (7th Cir.1974). Lorince has not invoked Rule 408 in responding to the government,

---

**24.** Although the fact that the Third Circuit's opinion is unpublished suggests that the panel which decided the case believed the opinion lacked "precedential or institutional value," *see* 3d Cir. Rules, App. 1 ("Internal Operating Procedures") ch. V § F(2), it does not appear that the Third Circuit prohibits citation to its unpublished opinions. *Compare* 7th Cir. Rule 53(b)(2)(iv).

**25.** The Court interprets Lorince's statement that he could not see the "near possibility" of settling for a greater sum to mean that he could not envision a remote chance of paying more money to the SBA, even at a later date. To read into the statement a suggestion that Lorince might be able to offer a further or greater payment at a later date would unduly strain Lorince's words, for nothing in his statement as a whole

holds out any hope of paying the SBA more than the small sum he offered in 1982 and again in 1984.

**26.** *Compare Harbaugh v. Herr,* 131 Kan. 235, 289 P. 957 (1930) (debtor's letter to creditor stating "I am not able to raise the money" to pay the debt at present, but "I hope to be able to do something [next year]" and "I expect to complete the payment as soon as I can" sufficed as a written acknowledgment renewing statute of limitations), *with Berghuis v. Burges,* 205 Minn. 151, 285 N.W. 464 (1939) (debtor's letter to creditor stating "I am sorry that I can not clean up this obligation, but I simply can not at this time" and making no pledge of payment in the future could not be construed as a promise to pay the debt which renewed the limitations period).

and the admissibility of the financial summaries upon which the government relies is therefore not in question. Nonetheless, the policy concerns which underlie Rule 408 Rule bespeak the problems of attaching binding significance to these summaries for purposes of the statute of limitations.

Courts have previously rebuffed attempts to use documents prepared in connection with settlement offers as admissions of liability. For example, in *Ramada Development Co. v. Rauch,* 644 F.2d 1097 (5th Cir.1981), a development company sued the owner of a motel to recover the amounts owed for construction of the motel. The motel owner counterclaimed, asserting that the developer had not fully performed on the construction contract and had been negligent in the planning and construction of the motel. At trial, the owner sought to introduce into evidence a report prepared for the developer by an architect concerning the flaws which the owner had cited in the construction of the motel. The owner argued that the report supported his arguments as to most of the defects. However, the trial court excluded the report under Rule 408, finding that the developer had commissioned the report as a basis for settlement negotiations which were ultimately unsuccessful. The court of appeals affirmed, agreeing that the report "appears to fit squarely within the exclusionary scope of rule 408." *Id.* at 1107. *Accord Blu–J, Inc. v. Kemper C.P.A. Group,* 916 F.2d 637, 642 (11th Cir. 1990) (independent evaluation prepared for purpose of exploring settlement "falls squarely within the *Ramada Dev. Co.* holding and the proscription of rule 408").

Relying in part upon the Fifth Circuit's opinion in *Ramada Development,* the Seventh Circuit held in *Kritikos v. Palmer Johnson, Inc.,* 821 F.2d 418, 422–23 (7th Cir.1987), that the trial court had erred in relying upon letters which the plaintiff's representative had written in connection with settlement efforts as evidence of the plaintiff's fault in a breach of contract action. These letters reflected the opinion that plaintiff himself was partly responsible for the delays which he had characterized as a breach of contract and that plain-

tiff's case would be difficult to argue. The court noted that the purpose of Rule 408 is to encourage settlements by allaying fears that the statements which a party makes in the course of settlement negotiations might later be used against him at trial as an acknowledgement of liability. *Id.* at 423. Because the letters at issue were written for purposes of exploring settlement, the Seventh Circuit concluded that it was improper for the trial court to rely upon them as substantive evidence of liability. *Id. See also Prudential Ins. Co. of America v. Curt Bullock Builders, Inc.,* 626 F.Supp. 159, 164 (N.D.Ill.1985) (Moran, J.) ("the admission of any statement made during, or any document prepared for, any kind of conciliation effort at least raises a Rule 408 issue").

The fact that the government is not relying upon the financial statements which Lorince submitted to the SBA for purposes of his settlement offer on the ultimate question of liability does not diminish the concerns reflected in Rule 408. Although the government is not attempting to cast Lorince's financial statements as an admission on the merits of this suit *per se,* it is attempting to cast the inclusion as something which is equally important—an acknowledgement of and promise to make good upon the guaranty sufficient to trigger a new limitations period and render this suit timely. The government relies upon those statements as evidence of Lorince's "promise" to repay his debt, a promise which would enable the government to get past the threshold statute of limitations problem.

A comparable attempt to use a settlement-related statement was rejected in *Trebor Sportswear Co. v. The Limited Stores, Inc.,* 865 F.2d 506 (2d Cir.1989). In that case, the plaintiffs had sued the defendant for breach of contract. The defendant moved for summary judgment, contending that the plaintiffs' claims were not enforceable under the statute of frauds, because there was no written memorandum evidencing any agreement between the parties. In response, the plaintiffs relied upon a letter and draft agreement which the

**1102**

defendant's officer had previously mailed to them in an effort to settle the dispute. The trial court disregarded these documents and entered summary judgment in favor of the defendants, holding that the documents constituted inadmissible evidence of a settlement offer. The court of appeals affirmed, rejecting the plaintiffs' contention that the documents were admissible for the limited purpose of satisfying the statute of frauds:

> Appellants urge that they sought to introduce the documents only in order to meet the statute of frauds. However, such a proffer presents two conflicting goals: proving the existence of a contract in compliance with the statute of frauds and overcoming the strictures of Rule 408. For appellants, satisfying the statute of frauds was the necessary first step to proving, ultimately, the validity of their claims of breach of contract. Since the two questions were so closely intertwined, admission of the documents even initially for the purpose of meeting the statute of frauds requirement would, under the circumstances of this case, militate against the public policy considerations which favor settlement negotiations and which underlie Rule 408.

*Id.* at 510 (citation omitted).

As in *Trebor Sportswear,* use of the financial summaries Lorince submitted to the SBA in connection with his settlement offers as a purported acknowledgement of the debt would be improper. Although the government relies upon these statements solely for purposes of satisfying the statute of limitations, even that use would effectively penalize Lorince for a statement made in connection with a settlement proposal and thus undermine the policy embodied in Fed.R.Ev. 408.

For these reasons, the Court finds that the financial statements submitted by Lorince on May 4, 1982 and February 15, 1984 were not written acknowledgments of his obligations under the guaranty sufficient to renew the six-year limitations period.

### IV. CONCLUSION

For the reasons set forth above, the government's motion for summary judgment is denied and Lorince's cross-motion for summary judgment is granted, the Court finding that this action is barred by the statute of limitations.